THE STATE OF IOWA, Appellee, v. E. S. BLYDENBURG, Appellant.

**Murder by poisoning:** EVIDENCE. Under a charge for murder by
1 administering a designated poison, it is necessary for the State to show the possession of that particular poison by defendant at the time of the alleged crime. Evidence reviewed and held insufficient to meet the rule.

**Evidence:** PRIVILEGED COMMUNICATIONS: PREJUDICE. The state-
2 ments of a patient made to his physician called to treat him professionally having relation to his condition and bearing upon the treatment to be administered are privileged; and a prolonged effort to get the same before the jury in defiance of an adverse ruling, by a course of examination indicating that defendant accused of murder, suffering under the sting of a guilty conscience had attempted self destruction, was so prejudicial that no amount of admonition from the court could eradicate the same.

**Same.** The State cannot show by its prosecuting attorney that
3 one accused of murder had, prior to the commission of the crime, stated to him that deceased had consulted counsel and if trouble arose he wished to retain his services; as the same was a confidential communication.

**Expert evidence:** PHYSICIANS: STATEMENTS OF PATIENT. A physician speaking as an expert witness concerning his diagnosis of a case which he was called to treat, may give the material and essential facts on which he bases his conclusion, and this covers statements of the patient concerning his condition past as well as present.

**Examination of witness:** ASSUMPTION OF FACTS. Neither the attorney for the State in his interrogatory nor the witness in his answer, in a prosecution of the husband for the murder of his wife, should be allowed to characterize an alleged conversation between them as "illtreatment" of the wife; and where the conversation as detailed was of a trivial character it should be excluded entirely.

**Evidence:** CONVERSATION: RIGHTS OF DEFENDANT. Where the State has been permitted to inquire into a certain act or conversation of the defendant, the court should not refuse defendant the right of denying or explaining the same.

**Instructions:** CIRCUMSTANTIAL EVIDENCE. To warrant conviction for a crime on circumstantial evidence alone, each fact in the chain of circumstances necessary to prove guilt must be proven by competent evidence beyond a reasonable doubt, and all the facts necessary to prove guilt must be connected with each other and with the main fact, and all the circumstances taken together must be of a conclusive nature, producing a moral certainty that the crime was committed.

**Same.** Where the guilt of a defendant rests entirely upon circumstantial evidence the jury should be so told. and the charge should state the rules of law governing cases in which circumstantial evidence is relied upon.

Bishop, J. in concurring opinion.

*Appeal from Hardin District Court.*— HON. J. H. RICH-ARDS, Judge.

WEDNESDAY, JULY 3, 1907.

INDICTMENT for murder in first degree. Verdict of guilty, and sentence of imprisonment for life. Defendant appeals.— *Reversed* and *remanded.*

*Wade, Duchter & Davis,* for appellant.

*H. W. Byers,* Attorney-General, and *C. W. Lyon,* Assistant Attorney-General, for the State.

WEAVER, C. J.— Jennie Blydenburg, wife of the defendant, died at their home in Eldora, Iowa, on May 29, 1903, and at the October, 1903, term of the district court for Hardin county, the grand jury returned an indictment, charging him with murder by arsenic poisoning. To this charge he pleaded not guilty, and from the judgment entered against him has brought the case to this court for the review of certain assigned errors. To their intelligent consideration, it is essential that we state some of the material facts. Defendant and deceased were married in Ohio in October, 1902, and soon thereafter came to Eldora, Iowa. He was then about thirty-eight years of age, and she several years, his senior. There is some evidence tending to show that some disagreement arose between them over property and other matters, but they continued to live together in at least outward appearance of harmony. The great preponderance of the evidence tends to show that the wife was in poor health for some time prior to her death, and was complaining of kidney trouble, though she was not confined to the house. On Sunday, May 24, 1903, she went to church alone, the defendant remaining at home with the children by a former marriage, a daughter of sixteen and a son of thirteen years of age. According to the testimony of defendant and of his son and daughter, the latter prepared the dinner without assistance, but there is evidence of alleged admission on defendant's part that he prepared it. The deceased returned from church about noon, and a little later she and her husband and the two children gathered at the table and partook of the dinner. About seven o'clock in the evening she complained of sickness at the stomach and headache, and soon began vomiting. About eight or nine o'clock defendant called a physician, Dr. Gethman, who seems to have then thought the sickness had been produced by food which de-

ceased had eaten. He prescribed arsenic as a suitable remedy, and left the medicine for her use. At nine o'clock on the following morning defendant called the doctor again, saying his wife was still very sick. At this visit the physician prescribed for the patient bismuth and nux vomica, which is the seed or material from which strychnine is prepared. On Tuesday or Wednesday another physician, Dr. Morse, was called in, and diagnosed the case as one of uræmia, a disease in which constituents of the urine, ordinarily eliminated by the kidneys, are retained in the blood. To satisfy himself upon the point, he analyzed a specimen of the urine of the patient with the result confirming his diagnosis. Dr. Morse also prescribed subnitrate of bismuth. The sickness of the deceased did not yield to treatment, and on the evening of May 29th she died. Her body was embalmed by injecting into the arteries and into the stomach and abdominal cavity at least half a gallon of embalming fluid, containing a very large percentage of arsenic. On the following day the body, accompanied by the defendant, was taken to Ohio, the former home of the deceased, and there buried. Thereafter suspicion having been aroused as to the cause of her death, the grave was opened on June 26th, and a local physician made a post mortem examination, removing from the body the left kidney and parts of spleen, heart, liver, lung, stomach and duodenum, which specimens were forwarded to Dr. Vaughn, an expert chemist at Ann Arbor, Mich. The examination by Dr. Vaughn developed the presence of a large amount of arsenic in the body.

There is no evidence to show that defendant ever purchased or procured or had any arsenic in his possession. It is conceded, however, that he had on one or two occasions some months prior to the death of his wife purchased a rat poison, known as " Rough on Rats," for the professed purpose of destroying the rats which infested his premises. It is the claim of the State, to which we shall again refer, that this poison is composed largely of arsenic. In addition to

the matters already related, the State relies for the support of the verdict on other minor circumstances too numerous to be set out at large, but among the most important of which we may mention alleged statements by defendant indicating his desire to get hold of property owned by his wife, alleged attempts by him to procure insurance on her life, words and acts indicating a lack of consideration or affection for her, and the alleged discovery upon the post mortem examination of discolorations and softened spots or patches upon the walls of the stomach, indicating, as it is claimed, the presence of the poison in the stomach before the death of the deceased. Practically all of the alleged incriminating circumstances, statements, and admissions are denied by the defendant, in some of which denials he is quite strongly corroborated, while the expert witnesses for the defense take issue with those of the State as to the condition of the stomach and what those conditions indicated. We now turn to the errors assigned by the appellant for a reversal of the judgment of conviction.

I. As appellant was charged with the commission of murder by the administration of arsenic, the possession by him of arsenic at the time of the alleged offense was a neces-

1. MURDER BY POISONING: evidence.

sary condition of his guilt. It was very important, therefore, for the State to trace, if possible, that particular poison to his hands. The only proof offered for which such effect is claimed was, as we have already stated, that appellant had on one or more occasions bought " Rough on Rats "; last occasion being two months prior to the alleged murder. No part of this article so sold was produced or identified on the trial. The pharmacist, one Steely, who made the sale, testified that he had never analyzed " Rough on Rats," and had no personal knowledge of its ingredients, but had bought and sold it in closed packages, and did not open or examine the contents of the package sold to the accused. He was then, over appellant's objection, permitted to produce and identify another

package taken from his stock of goods bearing as he said a
label and trademark like the package sold to appellant, and
stated to the jury what was the antidote for "Rough on
Rats" printed on said package. Dr. Vaughn was then
called, and, over like objection, testified that he had made a
"partial analysis" of the contents of the box produced by
the witness Steely, and had found arsenic in it; after further
saying that he could not estimate the proportion of arsenic,
that it would be "simply a guess," and being persistently
pressed by the prosecutor for a definite answer, he finally
thought he was safe in placing the proportion at 50 per cent.
On this evidence, and this alone, the State relied to establish
the possession by plaintiff of the alleged instrument of mur-
der, arsenic. We are strongly impressed with the conviction
that the appellant's objections should have been sustained.

The name "Rough on Rats" conveys no necessary sug-
gestion or definite information to the ordinary reader or
hearer concerning its real nature or quality, save, perhaps, a
somewhat far-fetched inference that it is a rat poison. The
reader of the advertising columns of the newspapers may
assume, as did one of the witnesses, that it is a "proprietary
article"; but this phase advances us not a step toward the
desired end. Indeed, it adds, if anything, to the uncer-
tainty, for the term "proprietary" is generally, though not
exclusively, applied to articles compounded or prepared ac-
cording to secret or patented formulas, and placed upon the
market under fanciful names, which give little or no hint of
their real nature. The court cannot take judicial notice
that "Rough on Rats" contains arsenic, or that the name is
always and everywhere applied to the same compound, or
that any two sealed packages taken from the same pharma-
cist's stock, and bearing such label, contain the same article;
nor is there in the record the slightest evidence on which
these questions could properly have been submitted to the
jury. The eminent specialists employed by the State did
not profess to recognize in "Rough on Rats," an article of

sufficiently definite and well-known character to enable them to say without analysis that this particular package taken at random from the pharmacist's stock contained arsenic. The State, therefore, succeeded in proving, not that the appellant purchased arsenic, or any article containing arsenic, but that some proportion of that poison was found in another package bearing a similar label and mark, taken from the same pharmacist's stock.

It is argued that this break in the continuity of the State's case is bridged over by the evidence of Dr. Morse, a witness for the defense, who testified on cross-examination that "Rough on Rats" is "supposed to be" a preparation of arsenic, and that Shumaker puts the proportion at 50 per cent. He does not claim to have any personal knowledge on the subject, either by way of analysis or otherwise. Conceding the eminent qualifications of the witness and of the writer whom he quotes, it remains true that the evidence as offered is that of mere supposition, based on hearsay.

We may add, also, that we are wholly at a loss to know on what theory the witness Steely was permitted to recite to the jury the printed statement on the package produced by him prescribing the proper antidote for poison by "Rough on Rats." It is not intended to hold that evidence is not admissible to show, if such be the fact, that Rough on Rats is a known and definite compound or preparation containing arsenic.

II. The State placed upon the witness stand Dr. Whitney, a practicing physician in the city of Eldora. This witness had no part in the treatment of the deceased, and did not undertake to speak as an expert concerning any matter directly connected with the case. He stated that on July 5, 1903, after the death of Mrs. Blydenburg, he was called in a professional capacity to visit the appellant, and there had a talk with him. That conversation the State sought to have the witness relate. Objection being made that to do

2. EVIDENCE: privileged communications: prejudice.

so would be a violation. of privilege, the witness was then examined as to the general nature of the statements, and said they were made by the appellant to explain his condition and had some bearing upon the treatment administered, though this statement he afterward modified to some extent. From this point the record presents some ten printed pages made in the attempt to avoid the objection, and get the conversation before the jury. The court finally ruled against the contention of the State, and struck out so much of the appellant's statements as the prosecutor had succeeded in getting into the record. Thereupon the direct examination proceeded as follows: "'Q. Did you know what the nature of defendant's affliction was before you arrived there? (Objected to as incompetent and immaterial, and an attempt to make revelation of a privileged communication. Objection sustained.) Q. You may state from what disease or condition the defendant was suffering that morning, if any? (Objected to as incompetent, immaterial, and privileged. Objection sustained.) Q. You may state whether or not defendant was suffering from having taken poison. (Objection, as before, sustained. Witness excused.)"

There is much in this record, the length of which is our excuse for not setting it out in full, to justify us in saying that the prosecutor here allowed his zeal of advocacy to betray him into palpable abuse of the privileges of counsel. This is especially marked in the last three questions above quoted. For a half hour or more he had been making repeated and strenuous effort to avoid both the rule of law which confronted him and the adverse holding of the trial court, and then, when the court had finally and decisively excluded the matter, counsel, in apparent deliberate disregard of the ruling against him, put the question: "You may state whether or not at that time the defendant was suffering from having taken poison." The counsel conducting this examination is an experienced lawyer, than whom none knew better the scope and extent of the privilege which

hedges about communications between physician and patient.

But, even if right in his contention for the admissibility of this testimony, it was impossible for him to have misunderstood the force and effect of the rulings of the court which stamped the evidence sought as incompetent for the purposes of that trial. He had made his record, and preserved his exception, and was bound by every rule of law and orderly practice to respect it. In failing to do so, and putting the question above quoted, we are forced to the conclusion that it was inspired, not by the hope of getting an answer, because the attitude of the court assured him that it would be excluded, not to make a record for the purposes of appeal, because the record was already complete, but rather to get it into the minds of the jurors that the defendant under the sting of a guilty conscience had attempted suicide. If " Rough on Rats " contains any more subtle or effective poison than did this question under the circumstances, then, indeed, it is a most powerful agent of destruction. There may be circumstances under which the injurious effects of such a question would be neutralized by the adverse ruling or by the injunction of the trial court, but such are not the circumstances here presented. The long and spirited discussion between counsel on either side, and the court was of a character to rivet the attention of the jurors and the persevering effort of the prosecution to break down the barrier of objections and adverse rulings, must naturally have excited their intense interest in anticipation of some startling disclosure if only the door thereto could be opened, and when counsel, defying the ruling against him, said in effect to the jury that, if permitted to do so, the witness would swear that appellant had attempted self-destruction, he inflicted an injury upon the defense, which no amount of admonition by the court could repair. *State v. Roscum,* 119 Iowa, 330; *State v. Ean,* 90 Iowa, 537.

III. The county attorney was also offered as a witness by his associate counsel to relate a conversation had with

appellant prior to the alleged murder.   Here again, as in
the case of Dr. Whitney, there was a long and
3. SAME.
spirited controversy over the question of priv-
ilege; it being contended by the defense that the communi-
cation, if any, was confidential.   When the prosecution car-
ried its point, the witness answered in effect that appellant
had said to him that his wife had consulted counsel concern-
ing their affairs, and he wished, if any trouble arose, to have
the witness look after his side.   In the opinion of the writer,
in which Deemer, J., concurs, this was properly stricken out.
The communication was essentially confidential in its nature,
and though ruled out of the evidence, it served nevertheless
to clinch in the minds of the jury the alleged fact that dis-
sension existed between the appellant and his wife.   That
fact was, of course, a proper one to go to the jury when shown
by competent witnesses; but it was not the right of the State
to break the seal of privilege which the law places upon the
communications of client to counsel.   And, if that rule is
ever to be strictly construed and rigidly enforced, it should
be in a criminal case where the defendant is on trial for his
life, and the prosecuting attorney offers himself as a witness.

IV.   Dr. Morse, the physician in attendance upon Mrs.
Blydenburg the last three days of her life, being examined as
a witness for defense, was asked:   " Q.  Doctor, I will ask
you what, if anything at the time you were
4. EXPERT
    EVIDENCE:    making the diagnosis of decedent's illness, did
physicians:
statements    she say as to her condition from which she
of patient.
was then suffering? "   The State having ob-
jected to the question, the court ruled that the doctor could
testify to what the patient said as to her then present exist-
ing condition, but could not be allowed to repeat what she
told him as to her previous condition, the history of her case.
This ruling was erroneous.   This witness, a physician, was
speaking as an expert, concerning his diagnosis of the case,
which he had been called to treat.  ·As was well said by him
to the court, ·" A physician does not form an opinion by

simply sitting down and looking at a patient." He inquires into the history of the development of the sickness, its duration, its symptoms, whether the patient suffers pain, what remedies have been employed, and every other circumstance which the patient can reveal which may aid in the recognition of the real nature of the malady to be treated, and from all these, considered in the light of his study and experience, reaches his conclusion. To require him to state the bare conclusion and exclude the material and essential facts on which it is based is to keep from the jury the best possible test by which it can properly weigh and estimate the value of the opinion expressed.

The general rule which excludes hearsay evidence is not open to any dispute, but it is subject to many well-recognized modifications and exceptions. Concerning the exception which we here recognize, there has been some discordance in the cases; but the view we have expressed has the support both of reason and of the weight of authority. That a non-expert witness may testify to exclamations and complaint of pain and suffering by a sick person has often been affirmed by this court. *Gray v. McLaughlin*, 26 Iowa, 279; *Keyes v. Cedar Falls*, 107 Iowa, 530; *Blair v. Madison*, 81 Iowa, 313; *McDonald v. Franchere*, 102 Iowa, 496; *Stone v. Moore*, 83 Iowa, 186; *Armstrong v. Ackley*, 71 Iowa, 76; *Aryman v. Marshalltown*, 90 Iowa, 350. The only case to the contrary is *Ferguson v. Davis*, 57 Iowa, 601, which was overruled in *Keyes v. Cedar Falls, supra*. Assuming that this rule is applicable only where the complaint is as to present sickness or suffering (though some of the precedents cited seem not to be so restricted), it is held by the better reasoned authorities that the restriction does not obtain as to statements made by the patient to a physician concerning the clinical history of his case. 5 Ency. of Evidence, 608. In *Barber v. Merriam*, 93 Mass. 322, the proposition has been very clearly and correctly stated follows:

The opinion of a surgeon or physician is necessarily formed in part on the statement of his patient describing his condition, and symptoms and the causes which have led to the injury or disease under which he appears to be suffering. This opinion clearly is competent as coming from an expert. But it is obvious that it would be unreasonable, if not absurd, to receive the opinion in evidence, and at the same time shut out the reasons and grounds on which it is founded. Such a course of practice would take from the consideration of a court and jury the means of determining whether the judgment of the expert was sound and his opinion well founded and satisfactory. Certainly it ought not to be left to the option of the adverse party to determine whether the elements on which the conclusions of a medical witness are based should be drawn out in cross-examination. The party producing the witness, and who relies on his opinion, should be allowed the privilege of showing that his testimony as an expert is the result of due inquiry and investigation into the condition and symptoms of the patient, both past and present.

The exception in favor of the testimony of a physician repeating the statements of a patient concerning the history of his ailment is again recognized in *Roosa v. Loan Co.*, 132 Mass. 439. See, also, to same effect, *Quaife v. Railroad Co.*, 48 Wis. 513 (4 N. W. 658, 33 Am. Rep. 821); *Yeatman v. Hart,* 6 Humph. (Tenn.) 374; *Cooper v. Bell,* 1 Head (Tenn.) 373; *Stone v. Watson,* 37 Ala. 279; *Feagin v. Beaseley,* 23 Ga. 17; *Meigs v. Buffalo,* 7 N. Y. St. Rep. 855; *Rogers v. Crain,* 30 Tex. 284; *Eckles v. Bates,* 26 Ala. 655; *Allen v. Vancleave,* 54 Ky. 236 (61 Am. Dec. 184); 1 Green, Evidence, section 102; *Cronin v. Railroad Co.,* 181 Mass. 202 (63 N. E. 335, 92 Am. St. Rep. 408); *Averson v. Kimmaird,* 6 East, 188; *Commonwealth v. McPipe,* 3 Cush. (Mass.) 181 (50 Am. Dec. 727); *Harriman v. Stowe,* 57 Mo. 93; *Kennedy v. Upshaw,* 66 Tex. 451 (1 S. W. 308); *Fay v. Harlan,* 128 Mass. 244 (35 Am. Rep. 372). In many cases testimony of this character has been admitted on the theory that it is

*res gestæ*. See *Puls v. Grand Lodge,* 13 N. D. 559 (102 N. W. 165); *Ins. Co. v. Mosley,* 75 U. S. 397 (19 L. Ed. 437); *R. R. Co. v. Sutton,* 42 Ill. 438 (92 Am. Dec. 81). The rule of these authorities is undoubtedly one to be applied with care to see that it is not unduly extended, but within the limits indicated we regard it a valuable aid in the discovery of truth.

Its importance in the present case is manifest when we remember that, according to the theory of the defense, Mrs. Blydenburg died of disease of long standing, or at least that such disease was sufficient to account for many of the alleged indications of poisoning. Dr. Morse was the attending physician at the time of her death, and apparently, after giving the case careful consideration, diagnosed her illness as uræmia, caused by a failure of the functions of the kidneys, which results in poisoning the system of the sufferer. In that attitude of the case the fate of the accused turned in a very large measure on the weight which the jury would accord to the opinion thus expressed. In order to intelligently and fairly pass upon that question, it was essential that the witness should be permitted to explain the basis of the diagnosis made by him. Under the ruling of the trial court, this right was denied, and that the error was prejudicial is too clear for argument.

V. A witness for the State was asked on direct examination: " State to the jury if you heard any conversation on the part of the defendant of a nature that was ill treating and cruel toward his wife. If so, state what the conversation was." Objection to this question was overruled, and witness allowed to state that on one occasion the deceased told the appellant that she wished he would drive down and take her out to the farm, and that he replied: " If you want to go to the farm, you will have to walk. I am not coming down here for you." The objection should have been sustained. The prosecutor should not have been allowed to characterize

5. EXAMINATION OF WITNESS: assumption of facts.

the alleged conversation in his interrogatory as "cruelty" or "ill treatment"; nor should the witness have been allowed to do so in his answer, as he inferentially did. Again, the matter stated by the witness was in itself of such trivial and inconsequential character that it should have been excluded entirely.

VI.    Among the incidents on which the State laid much stress as tending to show the appellant's guilt was the fact that, on arriving at his destination in Ohio with the body of

6. EVIDENCE:
conversation:
rights of
defendant.

his wife, he procured a steel or so called "burglar proof vault," in which the coffin was encased for burial. This circumstance was thought by the State of sufficient importance to justify it in bringing the undertaker who sold the vault from Ohio to Iowa to testify to the transaction, and to repeat the conversation had with the appellant. When the latter went upon the witness stand in his own behalf, his attention was directed by his counsel to the same transaction and he was asked: "Q. Do you remember what was said? A. Yes. Q. Tell me as near as you can." To this question the State objected as incompetent, irrelevant, and immaterial, and the objection was sustained. We think the trial court must have overlooked the fact that the State had been permitted to go into this matter, and give its version thereof at large. It is an elementary proposition that, when one party has thus introduced evidence of an alleged act of conversation in support of its case, the other party cannot properly be refused the right to deny the matter thus presented, or to admit it and make such explanation as may be relevant thereto. The objection should have been overruled.

VII.    It is also insisted on behalf of the appellant that the record discloses a manifest failure of proof of the *corpus delicti* — the death of Mrs. Blydenburg by arsenic poison, criminally administered by some one. On this point a majority of the court is inclined to the view that the showing made by the State was sufficient to carry that question to the

jury; and, as the judgment below must be reversed on other grounds and other evidence may be developed on a retrial, we refrain from entering upon a discussion of the facts.

VIII. The appellant requested the trial court to instruct the jury that: " To warrant a conviction on circumstantial evidence, each fact in the chain of circumstances necessary to be established to prove the guilt of the accused must be proven by competent evidence beyond a reasonable doubt, and all the facts and circumstances necessary to prove guilt must be connected with each other and with the main fact sought to be proved; and all the circumstances, taken together, must be of a conclusive nature, leading to a satisfactory conclusion and producing a moral certainty that the crime charged was committed, and that the accused committed it. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis."

7. INSTRUCTIONS: circumstantial evidence.

By another request, he asked that the jury be told that " each circumstance essential to the conclusion of the defendant's guilt should be fully established in the same manner and to the same extent as if the whole issue rested upon it." The court refused both requests.

This court is united in the opinion that the law is stated with substantial correctness in the instructions asked, and that the rule there announced was pertinent to the issue on trial, but we are not wholly agreed upon the question whether such rule was not in fact embodied in the instructions given upon the court's own motion. This difference of views upon the constructions of the language employed by the trial court proves at least that the law upon this point was not expressed with the clearness which is desirable in a case of such grave importance, and we advise that, upon another submission, it be restated in terms involving no ambiguity.

It is also to be said of the charge of the trial court that it defined both direct and circumstantial evidence,

and seems to have submitted the case to the jury upon the theory that there was in the record evidence of

8. SAME.

both classes or kinds from either or both of which the inference of guilt could be legitimately drawn. We think the jury should have been distinctly informed that the State's case rested entirely upon circumstantial evidence, and that in such connection the established and approved rules governing cases of this class should have been clearly set forth. Without going into any discussion of these rules, we have the following authorities in support of the views above expressed: *State v. Cohen*, 108 Iowa, 208; *Bradshaw v. State*, 17 Neb. 155 (22 N. W. 361); *State v. Maher*, 25 Nev. 465 (62 Pac. 236); *State v. Messimer*, 75 N. C. 385; *People v. Aikin*, 66 Mich. 460 (11 Am. St. Rep. 512); *Gavin v. State*, 42 Fla. 553 (29 South. 406); *Commonwealth v. Webster*, 5 Cush. (Mass.) 295 (52 Am. Dec. 711); *Sumner v. State*, 5 Blackf. (Ind.) 579 (36 Am. Dec. 561); *Clare v. People*, 9 Colo. 122 (10 Pac. 799); *Graves v. People*, 18 Colo. 170 (32 Pac. 63); *People v. Ah Chung*, 54 Cal. 398; Burrell's Cir. Ev. 733; *Hodge v. Territory*, 12 Okl. 108 (69 Pac. 1077); *State v. Gleim*, 17 Mont. 17 (41 Pac. 998, 31 L. R. A. 294, 52 Am. St. Rep. 655); *Jones v. State*, 107 Ala. 93 (18 South. 237); *People v. Foley*, 64 Mich. 148 (31 N. W. 94); *Adams v. State*, 31 Ohio St. 462.

For the reasons stated, a new trial must be ordered. Many other exceptions have been argued, but those we have considered sufficiently dispose of the case; and we shall not attempt their consideration. The judgment of the district court is *reversed* and cause *remanded.— Reversed.*

BISHOP, J. (concurring). This case is now before the court under rehearing. As presented on original submission, a part only of the matters now urged upon our attention by counsel for appellant were argued and relied upon for reversal. The principal matters of contention for error were three — the refusal of the court to give an instruction as

requested; error in the fifth instruction given, and the refusal of the court to grant a new trial because of the insufficiency of the evidence to support the verdict. In the request, defendant asked that the jury be told that, " to warrant a conviction on circumstantial evidence, each ·fact in the chain of circumstances necessary to be established . . . must be proven beyond a reasonable doubt," etc.· In the majority opinion filed on that submission, we held in substance that inasmuch as the trial court in the course of the charge had taken up separately and explained each constituent fact element of the crime necessary to be proven, and had in connection with each of such elements impressed upon the jury that the same must be proven beyond a reasonable doubt, the error in refusing the request, if such it was, was without prejudice. While confessedly the case of the State rested wholly on circumstantial evidence,· in the fifth instruction a definition in the abstract of direct evidence was also included. And the opinion held that such could not have been prejudicial, especially in view of the other instructions 'given. On the matter of the sufficiency of the evidence to warrant a verdict, the opinion expressed the affirmative view. On the subject of such former opinion I care only to add that I adhere to the views therein expressed.

Coming, now to the present opinion prepared by the Chief Justice, based largely on argument submitted on the rehearing for the first time, I agree that upon some, at least, of the grounds discussed, and for reasons as stated, the judgment should be reversed, and the case go back for a new trial.