THE STATE OF IOWA, Appellee, v. ANNA LONGSHORE MOON, Appellant.

**Criminal law:** ABORTION: INDICTMENT: BURDEN OF PROOF. On a prosecution for murder, the result of an unlawful attempt to produce a miscarriage, the state must allege and prove, not only the unlawful act resulting in death, but also that the act was not necessary to save the woman's life.

**Same:** STATEMENTS OF COUNSEL: THEORY OF CAUSE: EVIDENCE. Where counsel for defendant, on a prosecution for attempting to produce a miscarriage, told the jury in his opening statement that the plea of not guilty put in issue all the material allegations of the indictment and cast the burden upon the state to prove them, his contention that deceased had, previous to consulting defendant, attempted to produce a miscarriage upon herself and that such fact might have produced her death, was consistent with the theory that the act of defendant was necessary to save the life of decedent; and the exclusion of evidence of such necessity on the ground that the question was not in the case was improper.

**Same:** ABORTION: NECESSITY: BURDEN OF PROOF: ERRONEOUS RULINGS. On a prosecution for producing a miscarriage resulting in the woman's death, the necessity of the act as a means of saving her life is not a matter of defense but must be affirmatively shown by the state; and the erroneous rulings of the court placing this bur-

den upon the defendant were not cured by an instruction, that before the defendant could be convicted it must appear from the evidence that it was not necessary to produce the miscarriage to save her life, and that defendant's guilt must be proven beyond a reasonable doubt.

**Same:** ERRONEOUS RULINGS: PREJUDICE. Rulings of the court intended to lead the jury to believe that if defendant did not claim that a miscarriage was necessary to save the life of decedent that issue was immaterial to the case were erroneous; and the error was not cured by the admission of evidence tending to show such necessity.

**Same:** REMARKS OF COURT: PREJUDICE. The court's remark in ruling upon evidence of the necessity of producing a miscarriage to save decedent's life, that the lack of such necessity had been sufficiently proven was prejudicial; as that was a material inquiry and was for the jury to determine.

**Misconduct of counsel:** IMPROPER STATEMENTS: EXAMINATION OF WITNESS: PREJUDICE. Proof of other like crimes is not admissible on a prosecution for unlawfully producing a miscarriage; and the prosecutor's statement to the jury in opening the case that defendant had admitted the commission of other like offense was improper and prejudicial, and objection thereto should have been promptly sustained by the court. It was also improper and prejudicial for the prosecutor, after the court had ruled out evidence of that character, to persist in asking a witness how many cases of miscarriage he had been called to treat where the crime had been committed by defendant.

**Criminal law:** EVIDENCE: IMPEACHMENT: CROSS-EXAMINATION. By first calling a witness the state thereby certifies to his credibility; and when later called by defendant he testified to nothing detrimental to the state it was not proper for the state to attempt his impeachment by cross-examination. Nor was it proper where the witness merely testified for defendant, charged with abortion, that deceased died of blood poison caused by the use of an unsterilized instrument, to permit the state to show on cross-examination the close relationship of the witness and defendant by evidence that the witness had treated other cases of abortion committed by defendant.

**Same:** REMARKS OF COURT: PREJUDICE. A remark of the court on a prosecution for abortion that it was not proper to show "these other abortions that have been committed by this defendant or to introduce evidence tending to show anything of

that kind," while correct in excluding the evidence was unfortunate in so phrasing the ruling as to assume the fact of other like crimes by defendant.

Same: CONSPIRACY: DECLARATIONS OF THIRD PERSON. The declaration of one co-conspirator made in furtherance of the conspiracy are admissible in evidence against the others; but where one of the parties to a conspiracy for procuring an abortion consulted a third party on the subject, who was not a party to the alleged conspiracy, prior to the time defendant could have had any part in the transaction, the declarations of such third party were inadmissible.

Same. Where a conspiracy for committing an abortion was formed between the woman and the one responsible for her condition, a physician by subsequently uniting with them to perform the operation did not by so doing become bound by their acts and declarations previous to entering the combination.

*Appeal from Black Hawk District Court.*—HON. F. C. PLATT, Judge.

TUESDAY, OCTOBER 6, 1914.

THE defendant, having been indicted and convicted upon a charge of murder in the second degree, has taken an appeal from the judgment against her. The material facts are stated in the opinion.—*Reversed* and *Remanded.*

*J. C. Murtagh, Healy, Burnquist & Thomas,* and *Feely & Feely,* for appellant.

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, and *Wirt P. Hoxie,* County Attorney, and *E. H. McCoy,* Assistant County Attorney, for the State.

WEAVER, J.—The theory of the state's case is that Rebecca Shade, a young unmarried woman, having become pregnant by one Morris, the latter applied to the defendant, a practicing

physician, for the purpose of having a miscarriage produced upon the young woman, and that defendant, for a stated compensation, undertook to bring about the desired result. In pursuance of said alleged arrangement, it is claimed that a criminal operation was performed upon the young woman by the defendant, from the effects of which death ensued. A conviction having been obtained and new trial denied, the defendant appeals, seeking a reversal of the judgment because of alleged errors occurring at the trial.

There was evidence on the part of the state tending to establish its theory of the crime. To a considerable extent this evidence was furnished by the man Morris, who was a witness for the prosecution. He admitted his illicit relations with the deceased, her resulting pregnancy, and claimed that at her request he interviewed the appellant, who undertook to bring about an abortion. Pursuant to this agreement, he says Miss Shade went to defendant's office, where it is alleged an operation was performed upon her, from which place she repaired to a room to which she had been directed by defendant. It further appeared that the girl took the room mentioned on Saturday, October 28, 1912, and that she later became violently sick there, and, being removed to a hospital, died on the following Monday. The evidence also tends to show that, before consulting defendant, Miss Shade had visited other doctors, and by some of them had been given medicine, the use of which would or might tend to bring about a miscarriage. Evidence of the post mortem examination is also to the effect that the womb of the deceased was punctured or wounded, an injury which might have been produced by the use of an instrument employed to produce a miscarriage. Morris does not claim to have been present at the alleged operation, and there is no evidence to any dying statement by Miss Shade. The defendant admits that she was applied to by Morris and Miss Shade, who solicited her to bring about an abortion. This, she swears, she refused to do and did not do. It is unnecessary to incorporate here any further statement of the facts or alleged facts. It is enough, for the

purposes of this appeal, to say that defendant pleaded not guilty to the indictment, and as a witness averred her innocence of the offense, thus presenting the ordinary issues of fact for the consideration of the jury, and her appeal raises the question whether the record discloses error in the course of the trial sufficient to vitiate the verdict. Of the points made in argument, we note the following:

I. Under the law of this state, a person who, in an unlawful attempt to produce a miscarriage, inflicts injury upon a woman, from which she dies, is guilty of murder in the second degree. *State v. Moore*, 25 Iowa, 128. The statute which makes such an operation unlawful excepts from its prohibition a miscarriage produced or attempted, where such act or operation is necessary to save the life of the woman upon whom the operation is had. Code, section 4759. To justify a conviction of murder in such cases, the indictment must charge, and the evidence must show, beyond a reasonable doubt, not only the alleged act or attempt to produce the miscarriage, but also that such act or attempt was not necessary to save the life of the woman. *State v. Aiken*, 109 Iowa, 645. The indictment in this case makes the necessary allegation both of the wrongful use of an instrument for the purpose of producing a miscarriage upon the person of Miss Shade, and that such miscarriage was not necessary to save her life. Bearing in mind these facts and the rules of law to which we have adverted, the point of the first assignment of error argued, to which we are about to refer, will be readily apprehended.

1. CRIMINAL LAW: abortion: indictment: burden of proof.

It appears from the record that Dr. Clark, a woman physician, was called as a witness for the state, and having testified that she examined Miss Shade shortly before the alleged crime was committed, and found her pregnant, and that she discovered nothing to indicate the necessity of producing a miscarriage to save the young woman's life, counsel for the defense sought, upon cross-examination, to draw from

2. SAME: statements of counsel: theory of cause: evidence.

her some statement or admission that her examination of the deceased had not been sufficiently thorough to enable her to speak very positively concerning the necessity of a miscarriage. After a few questions of this nature had been asked and answered, a conversation or discussion occurred between the court and counsel for defendant, in the presence of the jury, as follows:

By the Court: I understand, from your statement to the jury, that there is no question involved in this case such as you are examining this witness on. Mr. Murtagh: This goes to the credibility of the witness, your honor. She testified generally as to the conditions. By the Court: You are examining her upon the question of whether it was necessary to perform the operation to save the life of this girl. You might with equal propriety examine her on the theory that it was necessary to amputate one of her limbs. Mr. Murtagh: Perhaps that is true, but would it not be admissible, on the credibility, to show the familiarity of the witness with the part affected and the general condition? By the Court: Well, it seems to me I would confine myself to the issue in the case, such as you have made in your opening statement. You have a right to examine this witness or any other witness as to their credibility.

Later another witness, Dr. O'Keefe, testified on the part of the state, and, having testified that he performed the autopsy upon the body of the deceased, the prosecuting attorney proceeded to interrogate him as an expert upon the subject whether the examination of the body revealed any conditions indicating necessity for a miscarriage in order to save the woman's life. The witness having answered in the negative, the court interrupted the examination, and the following colloquy between the presiding judge and the prosecutor ensued:

By the Court: I may be misinformed, but I do not understand that is in this case at all. Mr. McCoy: That is one of the things that the state have to prove. By the Court: Yes, but then that has been sufficiently done. There is no claim

made that this operation was performed for that purpose, as I understand it. Mr. McCoy: I don't know whether there is or not. By the Court: The opening statement of counsel was that there was no such defense. Mr. McCoy: I believe that was the inference from part of the statement of counsel. By the Court: If there is such defense, I would not limit the inquiry that was just made.

Error is assigned upon each of these rulings. The opening statement to the jury by defendant's counsel is set out in full in the record, and a reading of it fails to show

3. SAME: abortion: necessity: burden of proof: erroneous rulings.

anything in the nature of an admission that the alleged miscarriage, if one was produced, was not necessary to save the life of the deceased. On the contrary, the jury was reminded by counsel that the plea of not guilty operated to put in issue and cast upon the state the burden of proving every material allegation of the indictment. The statement did seem intended to impress the jury with the theory that, when Miss Shade called upon the defendant and asked to have an abortion performed, the young woman had already been making attempts to produce a miscarriage upon herself, with resulting abnormal conditions, which might account for her death. It is manifest that this theory is in no manner inconsistent with the thought that a subsequent attempt, if any, to produce, or aid in producing, a miscarriage was necessary to save life, for it may have been possible that, if Miss Shade had been taking medicine or using instruments upon herself to relieve her pregnancy before consulting defendant, conditions may have been so induced, rendering a miscarriage necessary to save her life. At least the court cannot say, as a matter of law, that such conditions were not possible, and certainly there is nothing in counsel's opening statement which is inconsistent with such theory.

The language of the court, in connection with the testimony of Dr. O'Keefe and Dr. Clark, indicates quite clearly

that the court's rulings were made on the theory that the

4. SAME: errone-ous rulings: prejudice.

question of the necessity of a miscarriage to save the young woman's life was a matter of defense to be advanced by the appellant and sustained by affirmative testimony, when, as we have seen, the burden was upon the state to negative the existence of such necessity, and, until such requirement was satisfied by proof beyond reasonable doubt, no case would be made upon which a conviction could be sustained. *State v. Aiken,* 109 Iowa, 643. That the ruling here complained of was error of very substantial character can scarcely be doubted. Counsel for the state seek to avoid the force of this objection by saying that, if error was thus committed, it was cured by the court's charge to the jury. It is true that the court, in stating the issues, said to the jury that, before a conviction could be had, it must be found from the evidence: (1) That Rebecca Shade was pregnant; (2) that defendant wrongfully used upon Rebecca Shade some instrument to produce a miscarriage; (3) that Rebecca Shade died on or about the time stated; (4) that such miscarriage was not necessary to save her life; and (5) that the death of Rebecca Shade was the direct and natural result of the use of such instrument. This enumeration is followed by the direction:

If you do not find, as you are told above is necessary to be found before you can convict the defendant, you should acquit her of the crime charged.

It will be observed that the jury is not here told, except inferentially, that each and all of these elements must be found before a conviction is justified, or that a failure to negative the necessity of saving life will require an acquittal, and (what is perhaps a still more serious omission) the jury is not told that these five fact propositions, or any of them, must be established beyond a reasonable doubt.

There is, in another part of the charge, a general statement that defendant cannot be convicted unless her guilt be shown beyond a reasonable doubt, but this we think falls mate-

rially short of informing the jury that, before it can be said
that the guilt of the accused is established beyond a reasonable
doubt, each of the essential allegations of fact must be proved
by that measure of evidence. But, even assuming that the
charge does state the issues and the general rules governing
them correctly, we are still persuaded that this was not suf-
ficient to correct the error occurring on the trial. The jury
were nowhere expressly told that such rulings were withdrawn,
nor would the mere formal statement in the court's charge
have the natural or necessary effect to remove the influence
of those rulings from the minds of the jurors. The court's
somewhat striking illustration that counsel might with as much
propriety examine the witness on the theory that it was neces-
sary to amputate one of the limbs of the deceased as to in-
quire into the necessity of the miscarriage to save her life, and
the further declaration from the bench that no "claim" was
made that the operation was necessary to save life, that the
question was "not in this case at all," that there was "no
such defense," and that, "if there was such defense," the
court would not limit the inquiry, could not have failed to
strongly impress the jury with the mistaken conclusion that,
if defendant did not claim or urge as a defense that the
alleged operation was necessary to save the life of the de-
ceased, then such question was not a matter of material con-
sideration. The fact that the witnesses, or some of them, did
answer that in their judgment no such necessity existed does
not in any manner serve to render the error harmless, for,
with the court's ruling left in the record, the jury could well
say that, as no such defense had been urged, the testimony
whether correct or incorrect was immaterial.

There is still another angle from which this feature of
the case may properly be considered. It will be seen, by
reference to the quoted part of the record,
that, in response to the court's suggestion
that the question was not in the case, the
prosecuting attorney responded that it was "one of the things
the state has to prove"; and the court answered:

5. SAME: re-
marks of
court: preju-
dice.

Yes, but that has been sufficiently done. There is no claim made that this operation was performed for that purpose, as I understand it.

In other words, it was ruled that, no claim of this kind having been made by the defendant, the question was out of the case, and that, even if it were in the case, the absence of any necessity for the operation "had been sufficiently proved." Aside from the objection already advanced that this ruling casts the burden upon the defendant to affirm this necessity, and not upon the state to negative it, it carries the equally fatal suggestion that, even if the state was charged with the burden of maintaining such negative, that proposition had already been proved. The statement by the court was doubtless inadvertent, but it seems nowhere to have been corrected or withdrawn. It needs, of course, no argument or citation of precedents to sustain the proposition that whether a material allegation in an indictment, on which issue has been taken by a plea of not guilty, has been sufficiently proved is a matter for the determination of the jury and not of the court. The question was thoroughly considered by us in *State v. Lightfoot*, 107 Iowa, 344, and we see no reason for departing from the well-established principles there approved. See, also, *State v. Philpot*, 97 Iowa, 365.

II. In his opening statement the prosecuting attorney said to the jury that after her arrest the appellant admitted to certain persons that she had performed many abortions and miscarriages, and that her price was $25 for single women and $15 for married women. Objection being made to this statement, the court refused the rule on it, saying it would be covered by proper instructions to the jury. In the court's charge to the jury they were instructed not to consider these statements of counsel. The record further shows that, on the evening before the death of Miss Shade, one Dr. Nesbit was called in to treat her or assist in her

6. MISCONDUCT OF COUNSEL: improper statements: examination of witness: prejudice.

treatment. He testified first for the state, and later, being called by the defendant testified that in his opinion the girl's death was caused by blood poisoning produced by the use of an unsterilized instrument, and he was quite frequently called to treat cases where abortions had been performed. Upon cross-examination the state's counsel interrogated the doctor as follows:

Q. Give your best judgment, Doctor, about how frequently you were called upon to attend abortion cases? A. I am called from one or two to probably three times a week; it is a very common thing to attend abortion cases. Q. Your judgment then is, Doctor, that you are probably called upon on an average of two or three times a week to treat abortion cases? A. Yes, sir. Q. How many of those cases have you cleaned up where Dr. Anna Longshore committed the abortion, if you know? (Defendant objects as incompetent, irrelevant, immaterial, suggestive, improper cross-examination, and prejudicial. Objection sustained. State excepts.) Q. How many times have you been called in cleaning up operations where Dr. Anna Longshore was the assistant to you? (Objected to as incompetent, irrelevant, immaterial, suggestive, improper cross-examination, and prejudicial. Objection sustained. State excepts.) Q. How many times have you been called by Dr. Anna Longshore for the purpose of cleaning up attempted abortion or abortions? (Defendant objects as incompetent, irrelevant, immaterial, suggestive, improper cross-examination, and prejudicial. Objection sustained. State excepts). Q. How many times, Doctor, have you been called by Dr. Anna Longshore to assist her in cases of any kind? (Defendant objects as incompetent, irrelevant, immaterial, suggestive, improper cross-examination, and prejudicial. Objection sustained. State excepts.) Mr. McCoy: Now, if the court please, the object of this examination is to show the association and acquaintance of this witness with the doctor. By the Court: Well, you can show that in some other way. It is not proper to show these other abortions that have been committed by this defendant, or to introduce evidence tending to show anything of the kind. I think I will sustain the objection. (State excepts.) Q. Are you acquainted with Dr. Anna Longshore, Dr. Nesbit? A. Yes, sir. Q. And how long has

your acquaintance with the lady extended? A. I think seven or eight years, ever since I have been in town. Q. Have you met her in a professional way? A. I have. Q. She has been to your office and you to hers. A. I never have been in her office. Q. Has she been in yours? A. I think she was in my office once; yes. Q. Communicated with her on the telephone, Doctor? A. I have once or twice. Q. Have you assisted her in any of her medical cases? (Defendant objects as incompetent, irrelevant, immaterial, prejudicial, and not the proper way of showing acquaintanceship of the witness with the defendant.) By the Court: Overruled, providing the question is referring to other than abortion cases. (Defendant excepts.) Q. Have you assisted her in any of her medical cases—have you ever assisted Dr. Anna Longshore in the treatment of any cases that were not abortion cases? (Defendant objects as incompetent, irrelevant, immaterial, prejudicial, and not the proper way of showing the acquaintanceship of the witness with the defendant. Objection overruled. Defendant excepts.) A. I have not, sir. By the Court: I think the form of that question was rather objectionable, and I will strike it out and the answer. You strike out the words that are in that question, and I think the answer will be proper, otherwise not.

It is the claim of appellant that the effect of the matters here referred to was to materially and improperly prejudice her before the jury and to deprive her of the fair trial to which she was entitled. The assertion of counsel in the opening statement, to the effect that appellant admitted, not the crime charged against her, but the producing of other abortions, was clearly improper, and the objection thereto should have been sustained. Under some circumstances, an error of this nature might properly be held to be without material prejudice, but where the statement of counsel is of matters so clearly inadmissible in evidence, and is of a nature likely to make deep impression on the minds of jurors, objection thereto should be promptly sustained, and the jury then and there admonished with respect thereto. It may further be added in this case that, the assertion of such immaterial and improper matters having been made, it could scarcely fail to accentuate

the unfavorable effect upon defendant's case in the minds of the jury caused by the course of counsel in the cross-examination of Dr. Nesbit, to which we have referred. It is not contended here by the state that it was entitled to prove other offenses or crimes not charged in the indictment, and it is scarcely conceivable that the prosecuting attorney believed such evidence could rightfully be admitted, if objection was made thereto. Having then once asked the question and obtained the court's ruling thereon that it was inadmissible, he could not thereafter repeatedly and persistently reiterate the inquiry in a form carrying with it the implication or insinuation that other offenses of that nature had been committed by the defendant, without abuse of a prosecutor's privilege sufficient to vitiate a conviction obtained under such circumstances. This has been very frequently held by this and other courts, and it is a rule so absolutely essential to a fair and impartial trial, that its propriety is not open to reasonable objection. *State v. Roscum,* 119 Iowa, 330; *State v. Ean,* 90 Iowa, 537; *People v. Derbert,* 138 Cal. 467 (71 Pac. 564); *State v. Irwin,* 9 Idaho, 35 (71 Pac. 608, 60 L. R. A. 716); *State v. Kirby,* 62 Kan. 436 (63 Pac. 752); *Cargill v. Commonwealth* (Ky.), 13 S. W. 916; *State v. Clark,* 163 Iowa, 1; *Flint v. Commonwealth* (Ky.), 23 S. W. 346; *People v. Cahoon,* 88 Mich. 456 (50 N. W. 384); *People v. Mullings,* 83 Cal. 138 (23 Pac. 229, 17 Am. St. Rep. 223); *Leahy v. State,* 31 Neb. 566 (48 N. W. 390); *State v. Blydenburg,* 135 Iowa, 270; *Hammer v. Janowitz,* 131 Iowa, 25; *State v. Greenland,* 125 Iowa, 145.

In the *Roscum* case, *supra,* where the prosecutor, after a ruling excluding evidence tending to show other offenses than the one on which the defendant was being tried, persisted in repeating similar inquiries to other witnesses, we held his conduct prejudicial to the rights of the accused, and reversed the judgment of conviction. We there said, and the remarks are quite in point here:

If the first offer could be excused as an act of good faith under a mistaken view of the legal rights of the state, no such charitable presumption can be invoked for the second and third attempts. Indeed, the purpose to get before the jury by indirection the fact that appellant was charged with other depredations, and thereby put him to a disadvantage in the pending trial, is too clear to admit of doubt. If convictions cannot be otherwise secured, it is far better to permit the guilty to go unpunished than to resort to exepdients which are essentially unfair and destructive of the settled rules of evidence.

In the *Blydenburg* case, *supra*, the state offered evidence tending to show that defendant had at one time contemplated or attempted suicide, and, the court having excluded it, the prosecutor continued with great persistence in questioning the witness on that point, although each successive interrogatory was ruled out. In holding this to be prejudicial error, we said that, even if the prosecutor was right in his contention that the evidence was admissible, yet:

It was impossible for him to have misunderstood the force and effect of the rulings of the court which stamped the evidence sought as incompetent for the purposes of that trial. He had made his record and preserved his exception, and was bound by every rule of law and orderly practice to respect it. In failing to do so, and putting the question above quoted, we are forced to the conclusion that it was inspired, not by the hope of getting an answer, because the attitude of the court assured him it would be excluded, not to make a record for the purposes of appeal, because the record was already complete, but rather to get it into the minds of the jurors that the defendant, under the sting of a guilty conscience, had attempted suicide.

In *People v. Mullings*, *supra*, the California court, upon a similar state of facts, says:

It is quite evident that the questions, and not the answers, were what the prosecution thought important. The purpose of the questions . . . was to keep persistently before the jury the assumption of damaging facts which could not be

proven, and thus impress upon their minds the probability of . . . assumed facts upon which the questions were based. To·say·that·such a course would not be prejudicial to defendant is to·ignore human experience.

It is argued on the part of the state that it was entitled to ask. these questions and have them answered to show the close relationship between Dr. Nesbit and defendant, and that the course of the examination of the witness was in no sense an effort to inject improper evidence into the record. It is enough to say in the first place that ·Dr. Nesbit was first placed upon the witness stand by the state, thereby certifying to his credibility. Moreover, he had testified to nothing adverse to the interests of the state or calling for any attempt at impeachment on its part. The form of the questions whether he had assisted or been called in to "clean up" abortions or attempted abortions performed by defendant carried with it the highly offensive imputation that she had in fact been guilty of other offenses of that nature, and had been obliged to call in the witness to assist in treating the victims of her criminal operations. The natural and necessary effect of these imputations was to discredit the defendant in the minds of the jurors, and it is no answer to say that no such effect was intended. Nor, as we have already suggested, is it sufficient to now insist that the evidence was admissible for any purpose. The court had ruled it out, and the defendant was entitled to the benefit of that ruling, and the state could not rightfully override it and deprive her of that benefit by pertinacious repetitions of the effort to get the rejected evidence into the record. A verdict so obtained cannot be permitted to stand.

7. CRIMINAL LAW : evidence : impeachment : cross-examination.

Before leaving the subject suggested by the appellant's assignments of error upon that part of the record last above stated, it is proper that we refer to the trial court's remark in ruling upon the admissibility of the evidence offered by the prosecutor with reference to other alleged offenses, saying:

8. SAME : remarks of court : prejudice.

It is not proper to show these other abortions that have been committed by this defendant or to introduce evidence tending to show anything of that kind.

The ruling was clearly correct in excluding the testimony; but the language accompanying it is unfortunately so phrased as to assume the fact of "other abortions committed by the defendant," thus intensifying the damaging imputation by the prosecutor. We take it for granted that the court did not intend such effect, but the expression used could hardly have failed to unduly embarrass the defense.

III. Complaint is made that certain incompetent and hearsay testimony was admitted over the objection of the defendant. Most of this testimony was admitted upon the state's theory that a conspiracy was entered into between the defendant and Morris and Miss Shade for the commission of the alleged offense. It is of course a well-settled rule that statements, declarations, and admissions by one of several conspirators, when made in furtherance of the conspiracy or in carrying out its unlawful purpose, are admissible in evidence against all or either of them. Under this rule, some of the objections cannot be sustained, but it is hardly broad enough to cover other rulings to which exceptions are taken. For example, in the testimony of Morris, an admitted accomplice and co-conspirator, he was permitted to relate the fact that before the defendant was consulted, and before she could have had part in the conspiracy, he attempted to find a certain doctor said to live on the west side of the city, concerning whose name there was some confusion, and that in the course of his search he consulted one Dr. Waddy, to whom he revealed the nature of the trouble he was in, whereupon, after advising marriage as the proper thing to do, Waddy said to him that the doctor he was hunting for "was probably Dr. Longshore." We think there is no rule of law by which the statements or suggestions of Dr. Waddy, who had no connection whatever with the case, could properly be put in evidence or repeated on the witness

*Margin note:* 9. SAME: conspiracy: declarations of third person.

stand by Morris, and this is emphatically true, where, at the time of the alleged conversation, the accused admittedly had not been consulted or had any part in the alleged conspiracy. Other testimony was admitted of alleged statements made by Miss Shade and Morris soon after the alleged criminal operation, but this class of testimony was explicitly withdrawn from the jury in the written instructions.

Such instructions, however, contained a further clause to the effect, or at least capable of the construction, that if Morris and Miss Shade entered into a conspiracy for the purpose of producing an unlawful miscarriage, and the defendant afterward united with them to perform such operation, she thereby adopted and became bound by their acts done and declarations made before her entry into the combination. This is contrary to the rule laid down in the similar case of *State v. Gilmore,* 151 Iowa, 618, where testimony of such prior statements is held incompetent as hearsay.

10. SAME.

Other exceptions taken by the appellant and argued by counsel are not well taken or pertain to questions not likely to arise on another trial. For the reason stated, the judgment of conviction must be set aside and cause remanded for a new trial.—*Reversed.*

LADD, C. J., and EVANS and PRESTON, JJ., concur.