PEOPLE v GREEN

Docket No. 59674. Argued June 6, 1978 (Calendar No. 3).—Decided January 26, 1979.

Ernest E. Green was charged with first-degree murder. While in jail awaiting trial he initiated a series of discussions with the detective who had investigated the crime. Two of these discussions occurred after counsel had been appointed to represent him. The first ceased when the defendant said he wanted to talk to his attorney. During the second discussion, the defendant not only waived his *Miranda* rights but also specifically stated that he wished to talk without his attorney present. An

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 7] 21 Am Jur 2d, Criminal Law § 312.
   63 Am Jur 2d, Prosecuting Attorneys §§ 3, 27.
   Accused's right to counsel under the Federal Constitution-Supreme Court cases. 18 L Ed 2d 1420.
   Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.
[2, 12-14] 7 Am Jur 2d, Attorneys at Law § 38.
   Attorney's dealing directly with client of another as ground for disciplinary proceeding. 1 ALR3d 1113.
[3, 17, 18] 7 Am Jur 2d, Attorneys at Law §§ 4, 38.
[4] 29 Am Jur 2d, Evidence §§ 1, 249.
[6] 21 Am Jur 2d, Criminal Law §§ 316, 317.
   Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.
   Accused's right to counsel under the Federal Constitution-Supreme Court cases. 18 L Ed 2d 1420.
[10, 11] 21 Am Jur 2d, Criminal Law § 312.
   29 Am Jur 2d, Evidence § 408.
   Accused's right to counsel under the Federal Constitution-Supreme Court cases. 18 L Ed 2d 1420.
   Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.
[8] 20 Am Jur 2d, Courts § 82.
[9, 14, 18] 29 Am Jur 2d, Evidence § 408.
[15] 21 Am Jur 2d, Criminal Law § 318.
   Accused's right to counsel under the Federal Constitution-Supreme Court cases. 18 L Ed 2d 1420.
[16] 20 Am Jur 2d, Courts §§ 64, 110.

assistant prosecuting attorney attended this discussion without communicating with the defendant's attorney. The defendant made an exculpatory statement, with details, that an unidentified acquaintance of his had admitted to him that he had done the killing with which the defendant was charged. The assistant prosecuting attorney took notes during this discussion and at the end asked the defendant if he had told the whole truth. The defendant said that he had. The defense objected to admission of the statement into evidence, but the objection was overruled and the statement was admitted. The defendant was convicted by a jury in Oakland Circuit Court, Robert L. Templin, J., of first-degree murder. The Court of Appeals, J. H. Gillis, P.J., and D. E. Holbrook, Jr., J. (M. F. Cavanagh, J., dissenting), affirmed (Docket No. 25298). Defendant appeals. *Held:*

The Court agreed unanimously that the prosecutor had violated the Code of Professional Responsibility when he took part in questioning the defendant without notifying defense counsel. Four justices agreed that exclusion of the exculpatory statement is not required by the violation of the code, and that the action of the assistant prosecutor was not a violation of due process of law. The conviction is affirmed.

Chief Justice Coleman, with Justice Ryan concurring, wrote separately:

1. The defendant's request to speak out of the presence of his attorney does not obviate the necessity for the prosecuting attorney to notify the defendant's attorney and obtain his consent under the Code of Professional Responsibility. There is more to this ethical prohibition than just the prevention of overreaching: the rights and interests of the adverse party's attorney and the proper functioning of the legal system are involved as well. While this defendant's initiative and insistence that he speak out of the presence of his attorney and the lack of overreaching by the assistant prosecuting attorney are factors to be considered in mitigation, they do not excuse compliance with the standards of professional conduct .prescribed by the code.

2. The provisions of the Code of Professional Responsibility are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary action against the offending attorney. The admissibility of evidence in a court of law, on the other hand, is normally determined by applicable

constitutional and statutory provisions, court rules and common-law doctrines. The Code of Professional Responsibility plays no part in such decisions. The violation of the disciplinary rule should be dealt with by bar disciplinary action to insure that future violations do not occur rather than by withholding relevant and material evidence from the jury.

3. In this case the defendant had a story he wanted to tell, presumably to clear himself of the murder charge lodged against him. He sent word to the authorities and asked to speak with them. He waived his constitutional rights with full knowledge of what he was doing, and specifically stated that he wanted to talk without his attorney present. The assistant prosecuting attorney and the detective did little except listen to what the defendant had to say and take notes. The defendant's statements were completely voluntary and there was no overreaching of any kind. When asked if he was telling the truth, defendant said that he was. Reversal of the conviction and grant of a new trial solely because of this violation of the disciplinary rule would be a less appropriate response, in cases such as this, than bar disciplinary action directed against the offending attorney. Although the presence of a prosecuting attorney is still one factor to be considered in assessing the "totality of the circumstances" in order to determine whether a defendant's statements are constitutionally admissible, there is no unconstitutional intrusion in this case.

4. The assistant prosecuting attorney's conduct is not so fundamentally unfair and shocking to the sensibilities of reasonable persons that it rises to the level of a violation of due process of law. Although there was a violation of the disciplinary rule, it was relatively innocuous. It pales in comparison to the cases in which a due process violation has been found. This is not a case in which the authorities used deception or force to extract a confession from an ignorant and helpless defendant. At most they acquiesced in a course of conduct initiated by a defendant who knew precisely what he was doing after they offered him the right to have counsel present and after that right was waived by the defendant.

Justice Williams, who was joined by Justice Fitzgerald, concurring in part, agreed that the exclusionary rule should not be extended to cover this case. However, he did not agree that the action of the assistant prosecuting attorney was "innocuous". The exclusionary rule is an indirect method to deter wrongful police action because the courts have no effective direct method of disciplining police officers. The courts do have a direct method of discipline to deter wrongful action by attorneys,

including prosecuting attorneys. The assistant prosecuting attorney's action in this matter should be reported to the Attorney Discipline Board for appropriate action to deter future violations of the Code of Professional Responsibility.

Affirmed.

Justice Kavanagh, joined by Justice Levin, concurred in the holding that the prosecutor had violated the disciplinary rule when he took part in questioning the defendant without first notifying defense counsel, but he did not agree that the defendant's statements should be admissible. The Court has a duty to supervise the procedure of trial as well as the practice of law. Here the evidence sought to be introduced was obtained in violation of one of the Court's established rules of practice. This action by the prosecutor is an affront to the whole profession for it diminishes the effectiveness of the attorney-client relationship and enfeebles the defendant's Fifth- and Sixth-Amendment rights. But the Court should not here be diverted by consideration of any violation of the defendant's rights. It should treat the affront to the Court and the procedure it has established. The exclusionary rule should be applied to deter unacceptable practice of this kind. The evidence should be suppressed to give unmistakable notice that in addition to exposure to disciplinary action, disregard of the rules will in no way assist an attorney in the performance of professional duty.

Justice Blair Moody, Jr., dissenting in part, wrote that the general rule should be that a prosecutor must be prohibited from interviewing a defendant without first obtaining the consent of defense counsel or the affirmation of defense counsel that he has advised the defendant of his rights and, following this advice, the defendant still wishes to be interviewed without him, and that failure to follow this rule should result in the suppression of resulting evidence. The prosecutor was a direct participant in the preparation for and the conducting of this interview. The influence of the prosecutor's presence upon the defendant is immeasurable. Defense counsel's presence could have substantially altered the interrogation. Furthermore, the prosecutor twice accompanied the detective to interrogate Green without notification to defense counsel. Such conduct necessitates reversal. Additionally, the prosecutor should be subjected to disciplinary action for his conduct.

Justice Levin, dissenting, wrote that a primary purpose of the disciplinary rule is to prevent parties represented by counsel from harming their cases by statements to opposing lawyers. Only suppression of a statement obtained in violation of the rule will vindicate that interest which the rule was de-

signed to protect, in criminal as well as in civil cases. Disciplinary proceedings against a lawyer who violates the rule will not undo the harm done another lawyer's client by violation of the rule.

1. The concept that persons are benefited by retention of and active representation by a lawyer is deeply ingrained in our legal system. The status that we afford this belief is most evident in the development of the Sixth-Amendment right to counsel in criminal proceedings; the ongoing constitutional debate over when and how this right may be waived reflects the high importance many attach to protecting a litigant, not only from the approaches of his adversary's lawyer, but from the folly of his own well-meaning initiatives and the generally unfortunate consequences of his ignorance. The same concept is reflected in the disciplinary rule at issue here.

2. The lead opinion avoids acknowledging that anyone other than a lawyer has an interest protected by the Code of Professional Responsibility, and thus need not come to grips with the effective protection of that interest. A primary purpose of the disciplinary rule is to shield the adverse party, not the adverse party's attorney. The emphasis on the protection of people goes beyond abstract concerns about the public reputation of the bar and general harm to society; the Code of Professional Responsibility recognizes that individuals can be concretely harmed by violations of ethical standards. The code's purpose of protecting individuals from becoming victims of unethical behavior has led courts to assume an active role in its enforcement, going beyond mere review of disciplinary proceedings that may reach the courts; they have exercised their supervisory power in particular cases to undo the damage caused individual human beings.

3. In civil cases, the courts have invariably acted to protect individuals who would otherwise have been victimized by violation of the disciplinary rule; they have not suggested that a disciplinary proceeding is the only appropriate and available remedy for a party who has been directly harmed. The prohibitions of the disciplinary rule apply equally in criminal and civil cases, and there is no principled basis for enforcing the rule in civil, but not criminal, cases. The Michigan and ABA ethics committees have refused to draw any distinction between violations in civil and criminal cases. The heart of the matter is that if the rule's purpose of protecting people is to be achieved, evidence obtained in violation of the rule must be suppressed. Disciplinary proceedings against a prosecuting attorney do not undo the harm caused an individual who otherwise might not

have been convicted. Other courts have suppressed evidence in criminal cases where a violation of the disciplinary rule has occurred. It is important to enforce the rule in criminal cases because the right to the continued advice of a lawyer, already retained or assigned, is the individual's protection against an abuse of power by the organized state.

4. Implicit in the holding that disciplinary proceedings are the only proper remedy for violation of Court-promulgated standards is the result that a court may not grant relief in cases of other rule violations such as the charging of an excessive contingent fee. Surely such results are not intended, but it will be difficult to advance a principled basis for making a distinction.

74 Mich App 351; 253 NW2d 763 (1977) affirmed.

OPINION BY COLEMAN, C.J.

1. CRIMINAL LAW — ATTORNEY AND CLIENT — DISTRICT AND PROSE-
   CUTING ATTORNEYS — PROFESSIONAL MISCONDUCT — COMMUNI-
   CATION WITH DEFENDANT.

   A defendant's request to speak to the authorities out of the presence of his attorney does not obviate the necessity for the prosecuting attorney to notify the defendant's attorney and obtain his consent under the Code of Professional Responsibility; while the defendant's initiative and insistence that he speak out of the presence of his attorney and the lack of overreaching by the prosecuting attorney are factors to be considered in mitigation, they do not excuse compliance with the disciplinary rules (Code of Professional Responsibility, DR 7-104[A][1]).

2. ATTORNEY AND CLIENT — PROFESSIONAL MISCONDUCT — COMMUNI-
   CATION WITH PARTIES.

   The reasons for the ethical prohibition on communication by an attorney with a party represented by counsel involve the rights and interests of the adverse party's attorney and the proper functioning of the legal system, as well as the prevention of ·overreaching (Code of Professional Responsibility, DR 7-104[A][1]).

3. ATTORNEY AND CLIENT — CODE OF PROFESSIONAL RESPONSIBILITY —
   DISCIPLINARY PROCEEDINGS.

   The Code of Professional Responsibility is comprised of self-im-posed internal regulations prescribing the standards of conduct

for members of the State Bar which is enforced by internal State Bar disciplinary action against the offending attorney; the provisions of the code are not constitutional or statutory rights guaranteed to individual persons.

4. EVIDENCE — ADMISSIBILITY — CODE OF PROFESSIONAL RESPONSIBILITY.

The admissibility of evidence is normally determined by applicable constitutional and statutory provisions, court rules and common-law doctrines; the Code of Professional Responsibility of lawyers plays no part in such decisions.

5. CRIMINAL LAW — EVIDENCE — DISTRICT AND PROSECUTING ATTORNEYS — PROFESSIONAL MISCONDUCT — COMMUNICATION WITH DEFENDANT.

Violation by the prosecuting attorney of the Code of Professional Responsibility disciplinary rule prohibiting communication with a defendant represented by counsel without obtaining counsel's consent standing alone should be dealt with by State Bar disciplinary action to insure that future violations do not occur rather than by withholding evidence from the jury or reversing the defendant's conviction and granting him a new trial (Code of Professional Responsibility, DR 7-104[A][1]).

6. DISTRICT AND PROSECUTING ATTORNEYS — PROFESSIONAL MISCONDUCT — ATTORNEY AND CLIENT — COMMUNICATION WITH DEFENDANT — DUE PROCESS.

Conduct of an assistant prosecuting attorney who listened to and minimally communicated with a defendant without notifying his attorney is not so fundamentally unfair and shocking to the sensibilities of reasonable persons that it rises to the level of a violation of due process of law, although the conduct is a violation of the Code of Professional Responsibility disciplinary rules, where, at most, the authorities acquiesced in a course of conduct initiated by the defendant who knew what he was doing after they offered him the right to have his attorney present and after that right was waived by the defendant who stated specifically that he wanted to speak without his attorney present. (Code of Professional Responsibility, DR 7-104[A][1]).

OPINION CONCURRING IN PART AND DISSENTING IN PART BY
WILLIAMS, J.

See headnotes 1-6.

7. DISTRICT AND PROSECUTING ATTORNEYS — PROFESSIONAL MISCON-
DUCT — ATTORNEY AND CLIENT — COMMUNICATION WITH DE-
FENDANT.

*Conduct of an assistant prosecuting attorney who communicated with a defendant without notifying his attorney should be reported to the Attorney Discipline Board for appropriate action to deter future violations of the Code of Professional Responsibility (Code of Professional Responsibility, DR 7-104[A][1]).*

OPINION CONCURRING IN PART AND DISSENTING IN PART BY
KAVANAGH, J.

8. COURTS — TRIAL.

*It is the duty of the Supreme Court to supervise the procedure of trial as well as the practice of law.*

9. CRIMINAL LAW — EVIDENCE — EXCLUSION — PROSECUTORIAL MIS-
CONDUCT.

*Evidence obtained in violation of established rules of practice should be excluded, not to vindicate any violation of a defendant's rights, but to deter unacceptable practice by the prosecution.*

10. CRIMINAL LAW — EVIDENCE — EXCLUSION — PROFESSIONAL MIS-
CONDUCT.

*Statements of a defendant obtained in violation of the Disciplinary Rules of the Code of Professional Responsibility when a prosecutor took part in questioning him without first notifying defense counsel should be suppressed to give unmistakable notice that in addition to exposure to disciplinary action, disregard of the disciplinary rules will in no way serve to assist an attorney in the performance of professional duty (Code of Professional Responsibility, DR 7-104[A][1]).*

OPINION CONCURRING IN PART AND DISSENTING IN PART BY BLAIR
MOODY, JR., J.

11. DISTRICT AND PROSECUTING ATTORNEYS — PROFESSIONAL MISCON-
DUCT — ATTORNEY AND CLIENT — COMMUNICATION WITH DE-
FENDANT — EVIDENCE — EXCLUSION.

*The general rule should be that a prosecutor must be prohibited from interviewing a defendant without first obtaining the consent of defense counsel or the affirmation of defense counsel that he has advised the defendant of his rights and, following this advice, the defendant still wishes to be interviewed without him; failure to obtain consent or affirmation should result in the suppression of any resulting evidence (Code of Professional Responsibility, DR 7-104[A][1]).*

12. Attorney and Client — Professional Misconduct — Communication with Adverse Party.

The prohibition in the Code of Professional Responsibility of any communication by a lawyer with an adverse party represented by a lawyer makes irrelevant who sought the interview (Code of Professional Responsibility, DR 7-104[A][1]).

13. Attorney and Client — Professional Misconduct — Communication With Adverse Party.

The primary purpose of the rule against communication by a lawyer with an adverse party represented by a lawyer is to protect persons represented by a lawyer from harming their cases by statements to opposing lawyers (Code of Professional Responsibility, DR 7-104[A][1]).

14. Attorney and Client — Professional Misconduct — Communication With Adverse Party — Evidence — Exclusion.

Only suppression of a statement obtained in violation of the rule against communication by a lawyer with an adverse party represented by a lawyer will vindicate the interest which the rule was designed to protect; disciplinary proceedings against a lawyer who violates the rule will not undo the harm done another lawyer's client by violation of the rule (Code of Professional Responsibility, DR 7-104[A][1]).

15. Attorney and Client — Right to Counsel.

The concept that persons are benefited by retention of and active representation by a lawyer is deeply ingrained in the legal system; the status this belief is afforded by the courts is most evident in the development of the Sixth Amendment right to counsel in criminal proceedings (US Const, Am VI).

16. Attorney and Client — Professional Misconduct — Remedies.

It would be anomalous for the Supreme Court to claim to be acting for the protection of the public and in the interest of the administration of justice and then refuse in individual cases to assure that particular persons are not harmed by unethical practices; the Court cannot protect the public except by protecting individuals.

17. Attorney and Client — Professional Misconduct — Remedies.

*Courts do not rely on disciplinary proceedings alone to effectuate the purposes of the Code of Professional Responsibility; they will do what is necessary to undo the results of unethical behavior and thereby protect individuals who have been harmed by such behavior.*

18. Attorney and Client — Professional Misconduct.

*Our legal system operates on the principle that the goal is the ascertainment of truth within the limitations imposed by law, which includes as a part of its very fabric the Code of Professional Responsibility regulating the conduct of lawyers in relation to those who encounter the legal system; no lawyer should be permitted to advance his client's cause with evidence obtained from another lawyer's client in violation of a rule designed as a safeguard against that very violation (Code of Professional Responsibility, DR 7-104[A][1]).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Kuirsky & Sharbaugh* for defendant.

Coleman, C.J. *(to affirm).* The defendant appeals his conviction of first-degree murder. The question presented is whether voluntary statements made by the defendant to a detective and an assistant prosecuting attorney after knowingly and understandingly waiving his right to an attorney and his right to remain silent must nonetheless be suppressed if the assistant prosecuting attorney violated Disciplinary Rule 7-104(A)(1) of the legal profession's Code of Professional Responsibility, which states:

"During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate

on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

The Court of Appeals ruled, one judge dissenting, that an ethics violation alone does not warrant or require the suppression of voluntary statements. 74 Mich App 351; 253 NW2d 763 (1977).

We affirm.

I

On October 19, 1974 at approximately 8:30 p.m., the victim left her home and drove to a nearby market to purchase some milk. She took her six-month-old child with her. Patrons of the market and a cashier saw her in the market with her child just before closing at approximately 8:45 p.m. Her husband awoke from a nap at approximately 11:45 p.m. and became worried when he discovered that she was not yet home. He telephoned a relative and together they began looking for her. At approximately 12:30 a.m., they found her car in the market parking lot with the keys in it and the child asleep on the front seat. After a futile search of the surrounding area, they drove the car home and telephoned the police.

The victim's whereabouts remained unknown until the late afternoon of October 21 when some hunters found her body floating in a nearby river. An autopsy performed the next day revealed that she had been stabbed once in the back and once in the chest. The chest wound was near the sternum. It penetrated through some soft tissue between the fourth and fifth ribs and continued through the front and back walls of the victim's heart. The back wound penetrated through both walls of the

victim's left lung. The cause of death was shock and hemorrhaging.

On October 23 a citizen spoke to the police and implicated the defendant in the murder. A police officer visited the man at his home and, while the officer listened on an extension, the man telephoned the defendant and expressed concern about the possibility of fingerprints or other incriminating evidence. The defendant said not to worry about these things.

On October 24 the police arrested the defendant and booked him for murder. The detective in charge of the case then drove the defendant to the area where the victim's body had been found and advised the defendant of his *Miranda*[1] rights by reading from a card that said:

"You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer before answering any questions and you have the right to have a lawyer present with you while you are answering these questions. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish one. You have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned."[2]

On the back of the card were these questions:

"Do you understand each of these rights I have explained to you? Do you want to talk to a lawyer before any questions? Will you waive your right to

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] Trial transcript, pp 15-16

remain silent and answer any questions we may ask you?"[3]

The defendant indicated that he understood his rights and would waive them. He then denied having any knowledge of the murder.

On October 28 the defendant sent a message to the detective asking to speak with him. The defendant complained that the guards at the jail were harassing him. That afternoon the detective visited the defendant at the jail. After hearing his *Miranda* rights and again waiving them, the defendant proffered a statement concerning his supposed whereabouts on the night of the crime and again denied having any knowledge of the murder. At the end of this discussion the detective asked the defendant if he was telling the truth and the defendant said that he was.

On October 31 counsel was appointed to represent the defendant.

On November 19 the man who originally implicated the defendant in the murder testified against the defendant at the preliminary examination. He had been the defendant's homosexual lover until the day of the arrest.

According to this witness, the defendant arrived at the home of a mutual acquaintance between 9 p.m. and 10 p.m. on October 19, 1974. At approximately 11 p.m. they all decided to go to a party in Detroit. As they entered the defendant's car, the defendant asked the acquaintance to hand him the coat lying on the back seat because "there's something in there that probably would be dangerous to him". After they returned from Detroit, the acquaintance was taken home. The defendant then said that he had something to tell the witness and

[3] *Id.,* pp 16-17.

that the witness could not tell anyone else about it. The defendant reached underneath the front seat of his car, pulled out a large knife and said that he "had just killed his old lady". When the witness expressed disbelief, the defendant said, "I'm serious" and proceeded to detail the circumstances of the crime. He said he stabbed her in the chest and "it went in easy". (To illustrate the location of the wound, he put the point of the knife on the chest of the witness near the witness's sternum.) He also said he left her keys and her sleeping child in her car and had dumped her body in the water near the area where the body eventually was found. When the witness continued to express disbelief, the defendant pointed to what he said was a bloodstain on the knife.

Shortly after this conversation, at approximately 4 a.m. on October 20, the defendant and the witness entered another car with some friends who were taking one of the passengers home. On the way to that residence, the defendant asked the driver to take a slight detour. The detour led past the market where the victim's car had been found. The defendant said that he wanted to "check out something". As they drove past the market, the defendant said, "It's gone."

Primarily on the basis of this testimony, the defendant was bound over for trial on an open charge of murder.

Sometime during the middle of November, the defendant again sent word to the detective, asking to speak with him. The detective and the assistant prosecuting attorney assigned to the case visited the defendant at the jail. However, when the detective advised the defendant of his *Miranda* rights, the defendant indicated that he wanted to speak with his attorney before talking further

about the case. The discussion ceased immediately at that point.

Near the end of January, 1975, the defendant again sent word to the authorities expressing a desire to talk.[4] On January 29 the detective and the assistant prosecuting attorney spoke with each other and then visited the defendant at the jail.[5] They did not communicate with the defendant's attorney. The detective advised the defendant of his *Miranda* rights. The defendant waived his rights and said that he wanted to talk to the authorities without his attorney present.[6] The detective asked about the murder and the defendant proceeded to tell an exculpatory story about driving to a store on the night of the crime to purchase some wine and meeting a man who revealed a large knife and said something about "killing

---

[4] At the *Walker* hearing before trial the detective testified:

"*Q. [by the prosecutor]:* Now, did you have occasion to interview him [the defendant] at any time after that?

"*A.* Yes, on January 29, 1975.

"*Q.* And where did that take place?

"*A.* At the Oakland County Jail.

"*Q.* Who was present?

"*A.* Yourself, myself and Mr. Green.

\* \* \*

"*Q.* And how did you come to be over there?

"*A.* Mr. Green had sent word from the jail through one of the deputies that he wished to talk to us." Trial transcript, p 27.

[5] There is little testimony about the conversation between the detective and the assistant prosecuting attorney. The detective testified at trial:

"*Q. [by defense counsel]:* Did you and [assistant prosecuting attorney] talk to each other before you interviewed Ernest Green on January 29, 1975?

"*A.* About what, sir.

"*Q.* About anything, about the interview?

"*A.* I presume we did, yes." Trial transcript, p 423.

[6] At the *Walker* hearing the detective testified as follows, speaking in response to defense counsel's questions:

"He [the defendant] waived his rights including the lawyer, he waived, he told us that he wished to discuss this case with us without you." Trial transcript, p 47.

this bitch". The defendant said he gave this man a ride to a bar and later discovered that the man had managed to slip the knife underneath the defendant's coat in the back seat of the defendant's car. The defendant said he threw the knife in some bushes next to a restaurant parking lot in Detroit. He refused to identify the man. At the end of this story, the assistant prosecuting attorney, who, up to that point, had only been taking notes, asked the defendant if he was telling the whole truth. The defendant said that he was.

Prior to trial an evidentiary hearing was held to determine the admissibility of the defendant's statements. After testimony was taken, defense counsel objected to the admission of the January 29 statements on the ground that the defendant had not been advised prior to making the statements that the penalty for first-degree murder was mandatory life. In passing, defense counsel added:

"I just think for an assistant prosecuting attorney and Detective Blum to interrogate Ernest Green and not advise him of that or even volunteer to invite me to the jail, I don't think that the admissions made on January 29, 1975 should be admissible."[7]

The trial judge overruled the objection and the statements were ultimately admitted into evidence at trial.

The jury convicted the defendant of first-degree premeditated murder.

## II

On appeal the defendant has not argued that his

_____
[7] Trial transcript, p 48.

statements were involuntary or that the authorities failed to comply with the *Miranda* requirements. Instead he contends that the statements should have been suppressed because the assistant prosecuting attorney violated DR 7-104(A)(1). Alternatively he contends that the statements should have been suppressed because the assistant prosecuting attorney's conduct was so fundamentally unfair and shocking to the sensibilities of reasonable persons that it violated general notions of due process of law.

The state responds that there was no violation of DR 7-104(A)(1) in this case because the defendant initiated the January 29 discussion, waived his right to counsel and indicated that he wanted to talk to the authorities without his attorney present. Further, the state argues that the assistant prosecuting attorney played only a minor role in the discussion, listening to the defendant and taking notes, and that there was no overreaching of any kind. Alternatively the state contends that the exclusionary rule does not apply to violations of the Code of Professional Responsibility. The proper action is disciplinary proceedings against the offending attorney. Finally, the state argues that if the admission of the defendant's statements at trial was error, it was harmless.

### III

The threshold question is whether the assistant prosecuting attorney violated DR 7-104(A)(1).

The Court of Appeals unanimously concluded that the assistant prosecuting attorney had acted improperly.

The state has conceded in its brief that prosecuting attorneys are not exempt from the strictures of

DR 7-104(A)(1).[8] The state argues, however, that no violation of DR 7-104(A)(1) occurred in this case because of the defendant's intention to speak with the authorities without his attorney present and because of the lack of overreaching by the assistant prosecuting attorney.

The argument that the defendant's request to speak out of the presence of his attorney obviates the necessity of notifying the defendant's attorney and obtaining his or her consent is contrary to opinions by both the American Bar Association and Michigan State Bar Association Committees on Professional Ethics.

In ABA Formal Opinion 108 issued in 1934, the Committee was asked to interpret the forerunner of DR 7-104(A)(1), old Canon 9, which stated:

"A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."

The question before the committee was whether the plaintiff's attorney in a civil case could ethically interview the defendant in the absence of the defendant's attorney if the defendant was willing to discuss the case. The committee unanimously answered in the negative and, after quoting Canon 9, stated:

"The reasons for such a prohibition are equally clear.

---

[8] Appellee's brief, p 30. See also Michigan State Bar Committee on Professional Ethics Opinion 202, 46 Mich St Bar J, No 5, pp 29-30 (1967).

They arise out of the nature of the relation of attorney and client and are equally imperative in the right and interest of the adverse party and of his attorney. To preserve the proper functioning of the legal profession as well as to shield the adverse party from improper approaches the Canon is wise and beneficent and\should be obeyed."[9]

In Michigan State Bar Opinion 202, issued in 1965 and approved by the State Bar Board of Commissioners in 1966, the committee was faced with the question whether Canon 9 prohibited a prosecuting attorney from interviewing a criminal defendant without first obtaining the consent of the defendant's attorney even if the defendant requested the interview without informing his or her attorney. The committee unanimously answered in the negative.[10]

The quotation from ABA Formal Opinion 108 set forth above indicates that there is more to this ethical prohibition than just the prevention of overreaching. The rights and interests of the adverse party's attorney and the proper functioning of the legal system are involved as well.

Ethical Consideration 7-18, adopted by the American Bar Association in 1975, emphasizes the importance of this ethical prohibition to the functioning of the legal system:

"The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has

[9] American Bar Association Opinions of the Committee on Professional Ethics (1967), p 360.

[10] 46 Mich St Bar J, No 5, pp 29-30 (1967).

the consent of the lawyer for that person."[11] (Footnote omitted.)

Other authorities have not exempted prosecuting attorneys from the strictures of DR 7-104(A)(1) in fact situations where the defendant requested an interview or was willing to speak and where there was no overreaching.[12]

The language of DR 7-104(A)(1) is clear and contains only two exceptions. It says "a lawyer shall not * * * communicate * * * with a party he knows to be represented by a lawyer * * * *unless* he has the prior consent of the lawyer representing [that] party or is authorized by law to do so". (Emphasis added.)

The state has not presented any reasons for a distinction between civil and criminal cases based on the defendant's willingness to speak and the lack of overreaching. Nor has the state addressed the concerns in addition to the prevention of overreaching expressed in the ethics opinions noted above.

We hold that while this defendant's initiative and willingness to speak and the lack of overreaching by the assistant prosecuting attorney are factors to be considered in mitigation, they do not excuse compliance with the standard of professional conduct prescribed by DR 7-104(A)(1).

### IV

Our resolution of the question above brings us to

---

[11] ABA Code of Professional Responsibility (1975), pp 33C-34C.

[12] See, for example, *United States v Carlson,* 423 F2d 431, 442 (CA 9, 1970), *cert den* 400 US 847 (1970); *United States v Four Star,* 428 F2d 1406, 1407 (CA 9, 1970), *cert den* 400 US 947 (1970); *United States v Springer,* 460 F2d 1344, 1353-1354 (CA 7, 1972), *cert den* 409 US 873 (1972); and *United States v Thomas,* 474 F2d 110, 111-112 (CA 10, 1973), *cert den* 412 US 932 (1973).

the principal dispute in this appeal—whether the voluntary statements made by the defendant after knowingly and understandingly waiving his *Miranda* rights must nonetheless be suppressed solely because the assistant prosecuting attorney violated DR 7-104(A)(1).

The Court of Appeals majority held that an ethics violation standing alone does not warrant or require the suppression of evidence.

The defendant has argued that the violation of DR 7-104(A)(1) was a violation of his rights and that unless his statments are suppressed, he will have no effective remedy to redress the wrong done to him.

This argument rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar.[13] Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary action against the offending attorney. The sanctions available are by no means trivial. The attorney faces permanent disbarment. In these respects the provisions of the code are no different from the provisions found in the codes of conduct for other professions, such as medicine or architecture. They are all self-governing, in-house regulations.

The admissibility of evidence in a court of law, on the other hand, is normally determined by

[13] For a recent discussion of the purposes and intended effect of a Code of Professional Responsibility, see Informal Opinion 1420 issued by the American Bar Association Standing Committee on Ethics and Professional Responsibility, June 5, 1978. It appears in the ABA Journal of July 1978. 64 ABA J 1173 (1978).

reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions.

Few courts have mixed the standard of conduct found in DR 7-104(A)(1) or any other provision of a code of professional responsibility into questions concerning the admissibility of evidence in criminal or civil cases. Even the courts which have embraced this novel concept have linked their decisions to do so with constitutional doctrines or statutory provisions not recognized or present in Michigan's jurisprudence. See, for example, *People v Hobson,* 39 NY2d 479; 348 NE2d 894; 384 NYS2d 419 (1976).

The defendant also has argued that if his statements are not suppressed this Court would in effect give its stamp of approval to unethical conduct. As this opinion clearly indicates in part III above, such a conclusion is unsupported. To the contrary, part III reflects a commitment by the Court to insure that future violations do not occur.

The facts in the case at bar provide a good example why a violation of DR 7-104(A)(1) standing alone should be dealt with by bar disciplinary action rather than by withholding relevant and material evidence from the jury.

The defendant had a story he wanted to tell to the authorities, presumably to clear himself of the murder charge lodged against him. He sent word to the authorities and asked to speak with them. He waived his *Miranda* rights with full knowledge of what he was doing. He specifically stated that he wanted to talk without his attorney present. The assistant prosecuting attorney and the detective did little except listen to what the defendant had to say and take notes. The defendant's state-

ments were completely voluntary and there was no overreaching of any kind. When asked if he was telling the whole truth, defendant said that he was.

Reversal of the conviction and grant of a new trial (if in fact the witnesses and evidence presented in 1975 could be obtained for a second trial) solely because of this less than consequential violation of DR 7-104(A)(1) would constitute reprehensible "overkill".

In cases such as this, bar disciplinary action directed against the offending attorney would be a more appropriate response and would serve as a more effective deterrent than the indirect sanction of the exclusionary rule. Although the presence of a prosecuting attorney is still one factor to be considered in assessing the "totality of the circumstances" in order to determine whether a defendant's statements are constitutionally admissible, we find no unconstitutional intrusion in this factual situation.

This resolution makes it unnecessary to consider the state's argument that if admission of the defendant's statements at trial was error, it was harmless.

## V

The final question is whether the assistant prosecuting attorney's conduct was so fundamentally unfair and shocking to the sensibilities of reasonable persons that it rises to the level of a violation of due process of law. We find that it does not.

As noted above, the assistant prosecuting attorney's conduct, although a violation of DR 7-104(A)(1), was relatively innocuous. It pales in comparison to the cases in which a due process

violation has been found. See, for example, *Rochin v California,* 342 US 165; 72 S Ct 205; 96 L Ed 183 (1952).

This is not a case in which the authorities used deception or force to extract a confession from an ignorant and helpless defendant. (Compare *Brewer v Williams,* 430 US 387; 97 S Ct 1232; 51 L Ed 2d 424 [1977], dealing with the right to counsel.) At most they acquiesced in a course of conduct initiated by a defendant who knew precisely what he was doing after they offered him the right to have counsel present and after that right was refused. We do not find this so unfair or so shocking that the defendant's conviction must be reversed.

We affirm.

Ryan, J., concurred with Coleman, C.J.

Williams, J. *(concurring in part; dissenting in part).* I concur with my sister Coleman's opinion that the prophylactic exclusionary rule need not, and should not, be extended to cover this case. However, while I agree that the assistant prosecuting attorney's action did not rise to the level of a violation of due process of law, I disagree that his action was "innocuous". I would affirm but order the Clerk to report this matter to bar grievance authorities for appropriate action.

The "prophylactic exclusionary rule" is an indirect method to deter wrongful police action. Since the courts have no effective direct method of disciplining police officers, this indirect method, which costs the public a retrial, has been justified.

However, with respect to attorneys, including prosecuting attorneys, the courts do have a direct method of discipline to deter their wrongful action. Attorneys can be disciplined by the bar grievance

authorities, and the courts can refer attorneys to them for appropriate action.

Therefore, to deter future action as here committed, without burdening the public criminal justice system with a retrial, and to directly reach the alleged wrongdoer, I would order the Clerk to report the assistant prosecuting attorney's action in this matter to the grievance authorities for appropriate action.

FITZGERALD, J., concurred with WILLIAMS, J.

KAVANAGH, J. *(concurring in part; dissenting in part).* I concur in the holding that the prosecutor violated DR 7-104(A)(1) when he took part in the questioning of Ernest Green without first notifying defense counsel. I do not agree that the defendant's statements should be admissible.

The opinion for affirmance sets forth the conventional view that disciplinary action under the established grievance procedure is an adequate method of dealing with violations of disciplinary rules. Violation of such rules, it is asserted, does not affect the admissibility of evidence.

The opinion also rejects the defendant's argument that without suppression of his statements he will have no redress for the wrong done to him.

I am convinced both the opinion and the defendant's argument misperceive the error and ignore this Court's duty to supervise the procedure of trial as well as the practice of law.

Here the evidence sought to be introduced was obtained in violation of one of this Court's established rules of practice.

This action by the prosecutor is an affront to the whole profession for it diminishes the effectiveness

of the attorney-client relationship, and enfeebles defendant's Fifth- and Sixth-Amendment rights.

But we should not here be diverted by consideration of any violation of defendant's rights. We should treat the affront to this Court and the procedure it has established. I would apply the exclusionary rule for the purpose of deterring unacceptable practice of the type involved in this case. *Elkins v United States,* 364 US 206, 217; 80 S Ct 1437; 4 L Ed 2d 1669 (1960).

The evidence should be suppressed to give unmistakable notice that, in addition to exposure to disciplinary action, disregard of our rules will in no way assist an attorney in the performance of professional duty.

LEVIN, J., concurred with KAVANAGH, J.

BLAIR MOODY, JR., J. *(concurring in part; dissenting in part).* I concur in the holding that the prosecutor violated DR 7-104(A)(1) when he took part in the questioning of Ernest Green without first notifying defense counsel. Under the circumstances of this case, I do not agree that the defendant's statements should be admissible.

The prosecutor was a direct participant in the preparation for and the conducting of this interview. The influence of the prosecutor's presence upon the defendant is immeasurable. Defense counsel's presence could have substantially altered the interrogation. Furthermore, the prosecutor twice accompanied the detective to interrogate Green without notification to defense counsel.

The general rule should be that a prosecutor must be prohibited from interviewing a defendant without first obtaining the consent of defense counsel or the affirmation of defense counsel that he has advised the defendant of his rights and,

following this advice, the defendant still wishes to be interviewed without him. Failure to do so should result in the suppression of any resulting evidence.

Accordingly, the conduct of the prosecutor in this case necessitates reversal. Additionally, the prosecutor should be subjected to disciplinary action for his conduct.

LEVIN, J. *(dissenting).* Ernest Early Green was convicted of first-degree murder.[1] The questions

[1] On October 19, 1974 Phyllis McPhail left her home, accompanied by her six-month-old son, to get some milk at a market in Pontiac. When she failed to return, her husband went to look for her and found her car in the market parking lot with the milk and keys in it and the little boy asleep. The police were called. Two days later her body was found floating in a river approximately one mile from the market. An autopsy established that she had died from shock and hemorrhage due to penetrating wounds of the heart and lung.

On October 24, 1974 Green was arrested and charged with the murder. Green was advised of his *Miranda* rights by a detective and questioned after he indicated that he waived them. Green denied knowledge of the murder. Four days later Green sent a message from the Oakland County Jail to the detective asking to speak with him about harassment by the jail guards. He visited Green that afternoon, advised him of his *Miranda* rights, and obtained a waiver. Green again denied having knowledge of the murder and gave the detective a detailed statement of his whereabouts that evening.

On October 31 counsel was appointed for Green.

On November 6 and 19 a preliminary examination was held, after which Green was bound over for trial. William Terry, Green's homosexual lover until the day of his arrest, testified at the examination that he and Green had driven from Pontiac to Detroit and back on the night the crime was committed. Terry testified that when he and an acquaintance entered Green's car to go to a party in Detroit, Green asked the acquaintance to hand him the coat lying on the back seat because "there [is] something in there that probably would be dangerous to him". Terry further testified that upon their return to Pontiac, Green looked for something under the car seat, found a knife, indicated to Terry that he "had just killed his old lady" with the knife, and proceeded to detail the circumstances of the crime. Shortly after this conversation, according to Terry, he and Green entered another car with some friends who were taking one of the passengers home. Green asked the driver to take a detour that led past the market where Mrs. McPhail's car was found so that he could "check out something". As they drove past, Green said, "It's gone."

In November, 1974, Green again requested that the detective come

presented are: 1) Whether a prosecutor violates DR 7-104(A)(1) of the Code of Professional Responsibility in obtaining a statement from a defendant represented by a lawyer, during a conversation initiated by the defendant, without the advice, consent or presence of his lawyer; 2) If so, whether the statement should have been suppressed.

The Court of Appeals ruled that the prosecutor violated the rule but that suppression was not justified, one judge dissenting. This Court affirms.

We all agree that the rule was violated and that it is applicable in criminal as well as in civil cases. We disagree whether the statement should be suppressed.

The rule provides:

---

to the jail. The detective *and* the assistant prosecuting attorney assigned to the case visited Green at the jail. After being advised of his *Miranda* rights Green indicated that he wished to talk to his lawyer before he talked to the detective.

On January 29, 1975, the detective and the assistant prosecuting attorney again came to the jail at Green's request. They did not attempt to communicate with Green's attorney. The detective again advised Green of his *Miranda* rights. This time he waived his rights and said he wanted to discuss the case without his lawyer being there. The detective asked about the murder and Green proceeded to tell an exculpatory story about driving to a store on the night of the murder, meeting and giving a ride to a man who revealed a large knife and said something about "killing this bitch", and later discovering that the man had slipped the knife under Green's coat in the back seat of the car. He said he threw the knife into some bushes next to a restaurant parking lot in Detroit. He refused to identify the man he had allegedly met and given a ride to. At the completion of his statement, the assistant prosecuting attorney, who up to that point had only been taking notes, asked Green if he was telling the whole truth. Green said that he was.

Prior to trial a *Walker* hearing was held to determine the admissibility of Green's statement of January 29. Green's lawyer objected to admission of the statement on the grounds that it was obtained without granting Green his right to counsel and, specifically, without advising him prior to making his statements that the penalty for first-degree murder was mandatory life. The judge overruled the objection and the statements were introduced at trial.

Green was found guilty of first-degree murder and sentenced to serve the mandatory life term in prison.

"During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." Code of Professional Responsibility, DR 7-104(A)(1).

The prohibition of *any* communication with an adverse party represented by a lawyer makes irrelevant who sought the interview.

It is well-established in Michigan that old Canon 9,[2] the forerunner of DR 7-104(A)(1), prohibited a prosecutor from interviewing a defendant without first obtaining the consent of his lawyer, even if the defendant requested the interview.[3]

A primary purpose of the rule is to protect

---

[2] "A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law." Canons of Professional Ethics, Canon 9.

[3] See Michigan State Bar Ethics Opinion 202, issued April 5, 1965 and approved by the Board of State Bar Commissioners November 18, 1966. The opinion is printed in 46 Mich St B J, No 5, pp 29-30 (1967), and in a special issue devoted to professional and judicial ethics, 57 Mich St B J, No 2A, pp 279-280 (1978).

The question, as stated in the opinion, is:

"The general counsel of the State Bar of Michigan inquires of the Committee concerning the ethical propriety of the interviewing of a defendant in a criminal case by a prosecuting authority without knowledge of his attorney. He notes that such usually arises in instances when a defendant himself has requested a private interview with the prosecutor without the knowledge or approval of his own counsel."

The black letter response reads:

"It is unethical and improper for a prosecuting authority to interview a defendant in a criminal case without the knowledge and consent of his attorney of record."

By informal opinion dated June 16, 1978, the Michigan committee ruled:

"An attorney for a defendant in a paternity suit may not communi-

persons represented by a lawyer from harming
their cases by statements to opposing lawyers.
Only suppression of a statement obtained in viola-
tion of the rule will vindicate that interest which
the rule was designed to protect. This is as true in
criminal as civil cases. Disciplinary proceedings
against a lawyer who violates the rule will not
undo the harm done another lawyer's client by
violation of the rule.

## I

The concept that persons are benefited by reten-
tion of and active representation by a lawyer is
deeply ingrained in our legal system. The status
we afford this belief is most evident in the develop-
ment of the Sixth Amendment right to counsel in
criminal proceedings.[4]

While many courts have ruled that a defendant
who is represented by a lawyer may be deemed to
have waived his lawyer's assistance by waiving his
*Miranda* rights,[5] other courts, on the authority of
the Supreme Court's summary reversal in *McLeod
v Ohio,* 381 US 356; 85 S Ct 1556; 14 L Ed 2d 682
(1965), have adopted a per se rule forbidding inter-

cate with the plaintiff who is represented by a prosecuting attorney
without first having obtained prior consent of the prosecuting attor-
ney." Informal Ethics Opinion CI-356, 57 Mich St B J 733 (1978).

[4] See, *e.g., Massiah v United States,* 377 US 201; 84 S Ct 1199; 12 L
Ed 2d 246 (1964); *United States v Wade,* 388 US 218; 87 S Ct 1926; 18
L Ed 2d 1149 (1967); *Brewer v Williams,* 430 US 387; 97 S Ct 1232; 51
L Ed 2d 424 (1977), *reh den* 431 US 925 (1977).

[5] See, *e.g., Moore v Wolff,* 495 F2d 35 (CA 8, 1974); *Coughlan v
United States,* 391 F2d 371 (CA 9, 1968); *Arrington v Maxwell,* 409
F2d 849 (CA 6, 1969); *United States v Dority,* 487 F2d 846 (CA 6,
1973); *United States v Reynolds,* 496 F2d 158 (CA 6, 1974); *United
States v De Loy,* 421 F2d 900 (CA 5, 1970); *Wilson v United States,*
398 F2d 331 (CA 5, 1968), *cert den* 393 US 1069 (1969); *United States
v Springer,* 460 F2d 1344 (CA 7, 1972), *cert den* 409 US 873 (1972);
*United States v Crisp,* 435 F2d 354 (CA 7, 1971), *cert den* 402 US 947
(1971); *United States v Crook,* 502 F2d 1378 (CA 3, 1974); *United
States v Brown,* 569 F2d 236 (CA 5, 1978).

rogation of a defendant represented by a lawyer in his absence once adversary proceedings have commenced.[6]

Still other courts have indicated that the Sixth Amendment right to counsel can be waived by a represented individual, but that being read a standardized form of *Miranda* rights does not provide the necessary information for an intelligent and understanding waiver.[7] The standardized form of *Miranda* rights states:

"You have a right to talk to a lawyer before answering any questions and you have the right to have a lawyer present with you while you are answering these questions. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish one."

A *pro forma* offer to appoint a lawyer for a defendant who already has one indicates that advice in that form is perfunctory and inappropriate.[8] These courts, stressing the Supreme Court's statement in *Brewer v Williams,* 430 US 387, 404; 97 S Ct 1232; 51 L Ed 2d 424 (1977), "[t]his strict standard applies equally to an alleged waiver of the right to

---

[6] See, *e.g., United States v Durham,* 475 F2d 208 (CA 7, 1973); *United States ex rel O'Connor v New Jersey,* 405 F2d 632 (CA 3, 1969), *cert den sub nom Yeager v O'Connor,* 395 US 923 (1969); *United States v Smith,* 379 F2d 628, 633 (CA 7, 1967), *cert den* 389 US 993 (1967); *Hancock v White,* 378 F2d 479 (CA 1, 1967). The Court in *Brewer v Williams, supra,* p 405, declined to decide whether the right to counsel could be waived without notice to counsel.

[7] See *Schantz v Eyman,* 418 F2d 11 (CA 9, 1969); *United States v Carlson,* 423 F2d 431 (CA 9, 1970); *United States v Satterfield,* 417 F Supp 293 (SD NY, 1976), *aff'd* 558 F2d 655 (CA 2, 1976); *United States v Miller,* 432 F Supp 382 (ED NY, 1977); *United States ex rel Lopez v Zelker,* 344 F Supp 1050 (SD NY, 1972), *aff'd* 465 F2d 1405 (CA 2, 1972), *cert den* 409 US 1049 (1972); *United States v Praetorius,* 457 F Supp 329 (ED NY, 1978); *Coughlan v United States,* fn 5 *supra* (Hamley, J., dissenting); *United States v Brown,* fn 5 *supra* (Simpson, J., dissenting).

[8] See *United States ex rel Lopez v Zelker, supra,* p 1054.

counsel whether at trial or at a critical stage of pretrial proceedings", require an in-depth inquiry similar to that made when a defendant waives assistance of counsel at trial. "[The defendant] should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'. *Adams v United States ex rel McCann,* 317 US [269,] 279 [63 S· Ct 236; 87 L Ed 268; 143 ALR 435 (1942)]." *Faretta v California,* 422 US 806, 835; 95 S Ct 2525; 45 L Ed 2d 562 (1975).[9] Adherents to this position would minimally require explanation to the defendant of the nature of the charges against him, the range of possible punishments, and *how* a lawyer can assist him.

This on-going constitutional debate reflects the high importance many attach to protecting a litigant, not only from the approaches of his adversary's lawyer, but from the folly of his own well-meaning initiatives and the generally unfortunate consequences of his ignorance. The same concept is reflected in DR 7-104(A)(1).[10]

## II

The lead opinion states that the Code of Professional Responsibility and the Disciplinary Rules are designed to protect "attorney[s]", the "proper functioning of the legal system" and "the public".

---

[9] See *People v Anderson,* 398 Mich 361; 247 NW2d 857 (1976).

[10] "[T]he same considerations of fairness that underline the concept of due process suggest that if a party does have a lawyer, that lawyer should be present during questioning of his client by an opposing attorney. DR 7-104 * * *, accordingly, protects a party against himself by ensuring that contacts with opposing attorneys will take place only through the party's own counsel or in his presence." Note, *DR 7-104 of the Code of Professional Responsibility Applied to the Government "Party",* 61 Minn L Rev 1007, 1012 (1977).

The opinion avoids acknowledging that any citizen, any plaintiff, any defendant, any individual human being who is not a lawyer has an interest protected by the code. Having failed to acknowledge that anyone other than a lawyer has a protected interest, it need not come to grips with the effective protection of that interest.

A primary purpose of the rule is to "shield the adverse party", not, as the lead opinion states, the "adverse party's attorney":

"The reasons for such a prohibition are equally clear. They arise out of the nature of the relation of attorney and client and are equally imperative in the right and interest of the adverse party and of his attorney. To preserve the proper functioning of the legal profession as well as *to shield the adverse party* from improper approaches the Canon is wise and beneficent and should be obeyed." ABA Committee on Professional Ethics, Formal Opinion 108 (1934) (emphasis supplied).

The emphasis on the protection of people goes beyond abstract concerns about the public reputation of the bar and general harm to society; the code recognizes that individuals can be concretely harmed by violations of ethical standards. This is a recurrent theme throughout the code and the opinions of the ABA committee.[11]

---

[11] In holding that it is improper for a prosecuting attorney to represent in a subsequent civil action one of the parties involved in an automobile accident which he had investigated in his official capacity, the committee said:

"The investigation of the prosecutor was ostensibly in the exercise of official authority; information was obtained from persons, who may have felt, quite naturally, under a sense of coercion or respect for actual or supposed power. *The person later sued as a tortfeasor may thus have disclosed facts inimical to his best interests in a civil action. Unsuspecting, unshielded, and at serious disadvantage, he submitted to interrogation by one who later, as opposing counsel in a civil action, might use the knowledge thus acquired against him.*

"Such approaches by an attorney in private practice are improper; *they are calculated to mislead to his prejudice* a party not repre-

The public is not an abstract entity; it consists of individuals who are the intended beneficiaries of the Court's actions in regulating the conduct of the bar. It would be anomalous for the Court to claim to be acting for the "protection of the public" and in the interest of "the administration of justice" and then refuse in individual cases to assure that particular persons are not harmed by unethical practices; the Court cannot protect the public except by protecting individuals.

The code's purpose of protecting individuals from becoming the victims of unethical behavior has led courts to assume an active role in its enforcement, going beyond mere review of disciplinary proceedings that may reach the courts. Rather than sit by and await possible disciplinary proceedings, the courts have exercised their supervisory power in particular cases to undo the damage caused individual human beings.

Courts have required counsel, on the authority of the disciplinary rules and canons,[12] to choose

---

sented by counsel, contrary to the provisions of Canon 9. The wisdom of this Canon is emphasized in Opinion 108.

"If the lawyer making the approach does so under sanction or color of official power, he thereby more certainly disqualifies himself from later participation as counsel in any civil litigation having its basis in or connected with the occurrence previously investigated as to its potential criminal aspects." ABA Committee on Professional Ethics, Formal Opinion 135 (1935) (emphasis supplied).

See, also, Formal Opinion 95 (1933).

[12] "A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

"(1) If the testimony will relate solely to an uncontested matter.

"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

"(4) As to any matter, if refusal would work a substantial hardship

between withdrawing from the case and having his otherwise admissible testimony on behalf of his client barred. This has been required not only in civil,[13] but also in criminal cases where the rule has been applied to both defense[14] and prosecuting attorneys.[15]

Courts have also acted pursuant to the disciplinary rules and canons, in both civil and criminal cases, to protect a former client when his lawyer subsequently represents an adverse interest.[16] Law-

on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." DR 5-101(B).

[13] See Anno: *Attorney as Witness for Client in Federal Case,* 9 ALR Fed 500; see, *e.g., Christensen v United States,* 90 F2d 152 (CA 7, 1937); *United States v Clancy,* 276 F2d 617 (CA 7, 1960), *rev'd on other grounds* 365 US 312; 81 S Ct 645; 5 L Ed 2d 574 (1961); *United States v Porter,* 139 US App DC 19; 429 F2d 203 (1970); *United States v Buckhanon,* 505 F2d 1079 (CA 8, 1974); *United States v Phillips,* 519 F2d 48 (CA 5, 1975), *cert den* 423 US 1059 (1976).

[14] See Anno: *Defense Counsel as Witness,* 52 ALR3d 887. See, *e.g., People v Smith,* 13 Cal App 3d 897; 91 Cal Rptr 786 (1970); *Fish v Commonwealth,* 208 Va 761; 160 SE2d 576 (1968); *People v Kuczynski,* 23 Ill 2d 320; 178 NE2d 294 (1961); *State v Bechtelheimer,* 151 Kans 582; 100 P2d 657 (1940); *People v Attaway,* 41 Ill App 3d 837; 354 NE2d 448 (1976); *State v Anonymous (1973-6),* 30 Conn Supp 211; 309 A2d 135 (Superior Ct, 1973); *People v Stratton,* 64 Mich App 349; 235 NW2d 778 (1975); *People v Johnson,* 46 Mich App 212; 207 NW2d 914 (1973).

[15] See Anno: *Prosecuting Attorney as Witness,* 54 ALR3d 100. See, *e.g., State v McCuistion,* 88 NM 94; 537 P2d 702 (Ct App, 1975); *State v Hayes,* 473 SW2d 688 (Mo, 1971); *Wilkinson v People,* 226 Ill 135; 80 NE 699 (1907); *People v Schraeberg,* 347 Ill 392; 179 NE 829 (1932); *Adams v State,* 202 Miss 68; 30 So 2d 593 (1947); *State v Blydenburg,* 135 Iowa 264; 112 NW 634 (1907).

[16] "The comment may be made that an attorney's misconduct is not so limited in its effect as to give rise only to questions involving the attorney's professional status: the practice of law being, by its nature, representative, wrongful acts on the part of an attorney will inevitably touch upon the rights of his clients and of his adversaries.

"Thus, it may be noted that in at least one case it has been held that, where an attorney, in attaching a note, represented persons whose interests were adverse to those of a former client, *the attachment was void as against public policy.* See *Malia v Giles,* 100 Utah 562; 114 P2d 208 (1941)." Anno: *Propriety and Effect of Attorney Representing Interest Adverse to that of Former Client,* 52 ALR2d 1243, 1276 (emphasis supplied).

See, also, Anno: *Representation of Conflicting Interests as Disqualifying Attorney From Acting in a Civil Case,* 31 ALR3d 715, 720:

yers have been disqualified in such circumstances,[17] and judgments in favor of the lawyer's new client have been reversed when necessary to protect effectively the interests of the former client.[18]

"Generally, it may be said that where an attorney represents two clients simultaneously and their interests are adverse, the court may disqualify him from appearing in the case * * *."

[17] See, *e.g., Westinghouse Electric Corp v Kerr-McGee Corp,* 580 F2d 1311 (CA 7, 1978); *State v Latigue,* 108 Ariz 521; 502 P2d 1340 (1972); *Alpha Investment Co v Tacoma,* 13 Wash App 532; 536 P2d 674 (1975); *Wilson v Wahl,* 182 Kans 532; 322 P2d 804 (1958); *GAC Commercial Corp v Mahoney Typographers, Inc,* 66 Mich App 186; 238 NW2d 575 (1975); *State v Rizzo,* 69 NJ 28; 350 A2d 225 (1975); *Auseon v Reading Brass Co,* 22 Mich App 505; 177 NW2d 662 (1970); *Harmar Drive-In Theatre, Inc v Warner Bros Pictures, Inc,* 239 F2d 555 (CA 2, 1956), *reh den* 241 F2d 937 (1957); *Fullmer v Harper,* 517 F2d 20 (CA 10, 1975); *Wingilia v Ashman,* 241 Mich 534; 217 NW 909 (1928).

In *Emle Industries, Inc v Patentex, Inc,* 478 F2d 562, 571, 575 (CA 2, 1973), the Court, on the basis of Canon 4 ("A lawyer should preserve the confidences and secrets of a client"), affirmed disqualification of a lawyer representing plaintiffs in patent litigation because of his previous representation of a part-owner of a defendant. Acknowledging that it is a serious step to deprive an individual of his choice of counsel and that some possibility of monopolization of the patent bar by the defendants existed, the court declared:

"The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require *application of a strict prophylactic rule* to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.

* * *

"* * * Nothing in the Code of Professional Responsibility or in the teaching of prior cases warrants such ethical relativity, for the Code, like its predecessor the Canons of Professional Ethics, 'set[s] up a high moral standard, akin to that applicable to a fiduciary. * * * Without firm judicial support, the Canons of Ethics would be only reverberating generalities'. *Empire Linotype School, Inc v United States,* 143 F Supp 627, 633 (SD NY, 1956)." (Emphasis added.)

[18] See, *e.g., Bugg v Chevron Chemical Co,* 224 Ga 809; 165 SE2d 135 (1968); *State v Burns,* 322 SW2d 736 (Mo, 1959); *People v Curry,* 1 Ill App 3d 87; 272 NE2d 669 (1971); *State v Chambers,* 86 NM 383; 524 P2d 999 (Ct App, 1974); *cert den* 86 NM 372; 524 P2d 988 (1974); *Sharplin v State,* 330 So 2d 591 (Miss, 1976); *Burkett v State,* 131 Ga App 662; 206 SE2d 848 (1974); *People v Kester,* 33 Ill App 3d 262; 337 NE2d 44 (1975), *aff'd* 66 Ill 2d 162; 361 NE2d 569 (1977); *State v*

In criminal cases, courts have found the Code of Professional Responsibility an independent basis for disqualifying a prosecutor from handling a case because of a personal or other relationship with the accused making it inappropriate for him to prosecute.[19] Also, indictments have been quashed or dismissed, and convictions reversed or habeas corpus relief granted.[20]

Recently, in *In re April 1977 Grand Jury Subpoenas,* 573 F2d 936 (CA 6, 1978), a panel of the United States Court of Appeals for the Sixth Circuit found that the Attorney General's appointment of an Internal Revenue Service lawyer to conduct a grand jury investigation of General Motors was violative of Canon 9 of the Code of

*Leigh,* 178 Kans 549; 289 P2d 774 (1955); *United States v Bishop,* 90 F2d 65 (CA 6, 1937); *Ward v State,* 33 Okla Crim 182; 242 P 575 (1926); *Baker v Farnsworth,* 117 Neb 504; 221 NW 17 (1928); *Tilley v King,* 190 Ga 421; 9 SE2d 670 (1940).

[19] See Anno: *Disqualification of Prosecuting Attorney on Account of Relationship with Accused,* 31 ALR3d 953. See, *e.g., State v Leigh,* 178 Kans 549; 289 P2d 774 (1955); *State v Burns,* 332 SW2d 736 (Mo, 1959); *Corbin v Broadman,* 6 Ariz App 436; 433 P2d 289 (1967); *Young v State,* 177 So 2d 345 (Fla App, 1965); *State v Latigue,* fn 17 *supra; People v Rhymer,* 32 Ill App 3d 431; 336 NE2d 203 (1975); *State v Britton,* — W Va —; 203 SE2d 462 (1974); *Burkett v State,* fn 18 *supra; State v Chambers,* fn 18 *supra.*

The California Supreme Court denied a writ to compel a trial court to permit a district attorney accused of a conflict of interest to prosecute a criminal charge. *People v Superior Court of Contra Costa County,* 19 Cal 3d 255; 137 Cal Rptr 476; 561 P2d 1164 (1977). The attorney general argued that the court could not disqualify the district attorney unless there would be a violation of "minimum due process standards". Invoking the Rules of Professional Conduct and its supervisory power, the court affirmed the trial court's order of disqualification. The court said:

"[I]f the trial court determines that a district attorney's participation in the filing of a criminal complaint or the preliminary hearing on that complaint created a potential for bias or the appearance of a conflict of interest, it may conclude that defendant was not 'legally committed' * * *. The Attorney General himself concedes the 'incongruity of ordering the district attorney removed from the prosecution but not setting aside the information filed by the district attorney.' " *Id.,* p 263, fn 5.

[20] Anno, fn 19 *supra,* 31 ALR3d 953, 984, 986.

Professional Responsibility. The panel stated that the IRS lawyer who had conducted a civil investigation of General Motors had

> "been placed in a conflicting and intolerable position.
>
> "[T]he function of the prosecutor * * * is also to protect citizens against unfounded criminal prosecution.
>
>      *    *    *
>
> "In the present case the worry of GM is that [the IRS lawyer] has an axe to grind and is more interested in justifying his previous investigations, his recommendations, and the conduct of IRS agents than in protecting GM against unfounded criminal prosecution." *Id.,* p 943.

While the Sixth Circuit *en banc* reversed the panel's opinion on the procedural ground that certification of the appeal was improvident,[21] what is relevant for present purposes is the relief that the Sixth Circuit panel deemed appropriate. The panel ordered that the cause be remanded "with instructions to terminate the grand jury investigation as invalid, and *to enter necessary protective orders relative to the use of the grand jury information". Id.,* p 945 (emphasis supplied).

The Court of Appeals, in *In re Karabatian's Estate,* 17 Mich App 541, 546-547; 170 NW2d 166 (1969), held that a lawyer who drafted a will under which he was a substantial beneficiary was without standing to contest a later will: "[A]pparently warnings do not suffice. If an attorney's conduct so violates *the spirit of the lawyer's code of ethics,* it also runs contrary to the public policy of this state. The bequest to contestant being void, he has no standing to contest the later will." (Emphasis supplied.)

One theme runs through the varied factual cir-

---

[21] 584 F2d 1366 (CA 6, 1978).

cumstances and results of these cases: courts do not rely on disciplinary proceedings alone to effectuate the purposes of the Code of Professional Responsibility.[22] They will do what is necessary to undo the results of unethical behavior and thereby protect individuals who may have been harmed by such behavior.

## III

I have not found a single civil case in any jurisdiction in which a court has suggested that disciplinary proceedings are the only appropriate and available "remedy" for a party who has been directly harmed by conduct violative of DR 7-104(A)(1). In civil cases, the courts have acted to protect individuals who would otherwise have been victimized by violations of the rule.[23]

---

[22] The Ohio Supreme Court declared that disciplinary action against the violator is not the sole relief available in *Cuyahoga County Board of Mental Retardation v Association of Cuyahoga County Teachers of the Trainable Retarded,* 47 Ohio App 2d 28; 351 NE2d 777 (1975), arising under the Code of Judicial Conduct. The court ruled that the judge's breach of the code rendered all of his actions null and void:

"In reaching this conclusion we begin with the fact that Rule IV of the Supreme Court Rules for the Government of the Bar of Ohio provides that the Canons of Judicial Ethics are 'binding' upon all judicial officers of the state * * *.

"We are not persuaded that these 'mandatory' and 'binding' standards were intended to be empty admonitions which a trial judge could openly disregard subject only to retrospective disciplinary action against himself, with no effect upon the improper actions which the canons were designed to protect against. Rather, we find that the design and purpose of the Code was to impose a standard of conduct upon judges to which they must conform." *Id.,* pp 33-34.

[23] In *Mitton v State Bar of California,* 71 Cal 2d 525; 78 Cal Rptr 649; 455 P2d 753 (1969), plaintiff's lawyer in an automobile accident case was accused of violating professional ethics by conferring with a defendant represented by a lawyer concerning defendant's motion for a new trial after a jury verdict against her. It appears that with no notice given to defendant's lawyer, plaintiff's lawyer in conjunction with defendant drew up a declaration stating that the motion for a new trial was without defendant's consent and against her wishes. Defendant signed this declaration. The declaration was offered at the time the motion for new trial was set for hearing. The hearing judge

DR 7-104(A)(1)'s prohibitions apply equally in criminal and civil cases. There is no principled basis for enforcing the rule in civil, but not criminal, cases. Since the stakes in criminal cases are generally higher, and incarceration tends to put defendants under pressure to seek out the prosecutorial authorities in a generally hapless effort to extricate themselves,[24] the need for protecting defendants in criminal cases is most compelling. Both the Michigan and ABA ethics committees have refused to draw any distinction between violations of the rule in criminal and civil cases.[25]

---

not only called this incident to the attention of the state bar, but refused to accept or consider the declaration because defendant's lawyer had not been notified or consulted.

In *Obser v Adelson,* 96 NYS2d 817 (Sup Ct, 1949), aff'd 276 App Div 999; 95 NYS2d 757 (1950), a motion to suppress evidence was at issue. An action was brought on behalf of an infant injured as a result of alleged negligence. The infant's father retained a lawyer who advised defendants of the infant's claim. Defendants' lawyer was also notified of the claim by plaintiff's lawyer. Subsequently, a representative of defendants' lawyer obtained a statement from the infant's mother. The court directed that the statement be "suppressed and that the defendants be not permitted to use the same for any purpose whatsoever." *Id.,* p 818.

See, also, *Chilcutt v Baker,* 355 SW2d 338 (Mo, St Louis Ct App, 1962).

[24] Once a defendant has exercised his right to counsel, the question of waiver of his counsel's assistance should not depend on the outcome of the "almost inevitable 'swearing contest' over what happened behind the closed doors". Kamisar, LaFave & Israel, Modern Criminal Procedure (4th ed), p 513. See, also, *People v Hobson,* 39 NY2d 479, 484-485; 384 NYS2d 419; 348 NE2d 894, 898 (1976); *United States v Wade,* 388 US 218, 229-231; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *Commonwealth v Sparrow,* 471 Pa 490, 514-515; 370 A2d 712, 725 (1977).

[25] See fn 3, *supra.*

In Informal Opinion 1373 (1976) the ABA committee considered the propriety of a prosecuting attorney mailing a plea offer to both a defendant and his lawyer. The committee concluded:

"In the view of the committee, the sending of a copy of the offer to the defendant is unethical in that it violates DR 7-104(A)(1). * * *

"The committee had occasion recently in Informal Opinion 1348 to consider the rule in the context of a civil matter. The committee held that it was improper to send a copy of a settlement offer to the other party (the original going to the attorney) * * *. *We see no valid*

The heart of the matter is that if the rule's purpose of protecting people is to be achieved, evidence obtained in violation of the rule must be suppressed. Disciplinary proceedings against a prosecuting attorney do not undo the harm caused an individual who otherwise might not have been convicted.

Further, it is uncertain what, if any, grievance action will be taken. It will often be left to the defendant or his attorney to report ethical violations and initiate disciplinary proceedings. It flies in the face of reason to expect a defendant to risk a prosecutor's actual or imagined displeasure by instituting proceedings that cannot directly benefit him. The defendant may not unreasonably believe such action will adversely affect his case in subsequent proceedings at the trial, on appeal or at a retrial following an appeal, or his later chances for parole.

It is unlikely that a defendant has any cause of action for damages against a prosecutor.[26] Even if a defendant has such a remedy, few will think that a loss of liberty can be adequately compensated, especially, as here, where the defendant has been imprisoned for life.

In *McAvoy v H B Sherman Co,* 401 Mich 419; 258 NW2d 414 (1977), this Court recognized the need for providing effective remedies. The Court

---

*reason for a different result in criminal matters. In fact, there are perhaps stronger policy considerations in criminal cases.* A copy of a letter such as the sample furnished could have the effect of influencing a defendant to plead guilty to a crime for which no indictment might ever be returned. The defendant should have the advice of his counsel at hand when such an offer is transmitted to him." (Emphasis supplied.)

[26] *Cf.* Mallen & Levit, Legal Malpractice (1977), § 117; see, *e.g., Merritt-Chapman & Scott Corp v Elgin Coal, Inc,* 358 F Supp 17 (ED Tenn, 1972); *Spencer v Burglass,* 337 So 2d 596 (La App, 1976); *Noble v Sears, Roebuck & Co,* 33 Cal App 3d 654; 109 Cal Rptr 269 (1973); *Tingle v Arnold, Cate & Allen,* 129 Ga App 134; 199 SE2d 260 (1973).

sustained the action of the Worker's Compensation Appeal Board in dismissing employer appeals for violation of a statute requiring payment during an employer's appeal to a claimant of 70% of the weekly benefit rate ordered by a hearing referee. The statute did not explicitly require or authorize dismissal. Other remedies might have been employed, such as entry of an immediately enforceable monetary judgment. This Court held, however, that the purposes of the statute would be rendered meaningless unless the board could dismiss the appeals of those who violated the statute.

In the instant case the only meaningful remedy is suppression of the unethically obtained evidence. The Court cannot justify promulgation of DR 7-104(A)(1), designed to protect people, often from themselves, but, when actual abuse occurs, failure to enforce that protection in a meaningful manner.

An excuse is sometimes offered that the overriding importance of disclosing the truth justifies a court's failure to suppress illicitly obtained evidence. But our legal system operates on the principle that the goal is the ascertainment of truth within the limitations imposed by law. Lawyers— prosecutors especially—play an important role in the administration of justice and thus the Code of Professional Responsibility regulating their conduct in relation to those who encounter the system is part of the very fabric of the law. There can be no ordered system of law if those for whose protection the code has been promulgated are not effectively protected from harm caused by its violation. No lawyer should be permitted to advance his client's cause with evidence obtained from another lawyer's client in violation of a rule designed as a safeguard against that very violation.

Courts have suppressed evidence in criminal cases where a violation of DR 7-104(A)(1) has occurred.

In *United States v Thomas,* 474 F2d 110, 112 (CA 10, 1973), a written statement was obtained from the defendant in the absence of and without the knowledge of his lawyer. The statement was obtained at an interview requested by the defendant at which he read and signed a *Miranda*-type waiver of rights form. The Court held that the ethical violation required suppression of the statement:

"[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. *To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the Canons of Ethics.* This is obviously not something which the defendant alone can waive." (Emphasis supplied.)

The New York Court of Appeals in *People v Hobson,* 39 NY2d 479; 384 NYS2d 419; 348 NE2d 894 (1976), held that New York's constitutional protections[27] prevented a defendant in custody, represented by a lawyer, from waiving his right to counsel in the absence of his lawyer. The Court said that apart from the constitutional violation, the statements should have been excluded under the Code of Professional Responsibility:

---

[27] The court identified the "State's constitutional and statutory guarantees of the privilege against self-incrimination, the right to the assistance of counsel, and due process of law". *People v Hobson, supra,* p 483. Michigan's Constitution recognizes and protects the same values and interests. Const 1963, art 1, §§ 13, 17, 20.

"Moreover, an attempt to secure a waiver of the right of counsel in a criminal proceeding in the absence of a lawyer, already retained or assigned, would constitute a breach of professional ethics, as it would be in the least-consequential civil matter (see ABA Code of Professional Responsibility, DR 7-104, subd [A][1]) * * *. Since the Code of Professional Responsibility is applicable, *it would be grossly incongruous for the courts to blink its violation in a criminal matter." Id.,* pp 484-485.

The Court then explained why it is important to enforce DR 7-104(A)(1):

"[T]he principle is not so much, important as that is, to preserve the civilized decencies, but to protect the individual, often ignorant and uneducated, and always in fear, when faced with the coercive police power of the State. *The right to the continued advice of a lawyer, already retained or assigned, is his real protection against an abuse of power by the organized State.* It is more important than the preinterrogation warnings given to defendants in custody. These warnings often provide only a feeble opportunity to obtain a lawyer, because the suspect or accused is required to determine his need, unadvised by anyone who has his interests at heart. The danger is not only the risk of unwise waivers of the privilege against self incrimination and of the right to counsel, but the more significant risk of inaccurate, sometimes false, and inevitably incomplete descriptions of the events described." *Id.,* p 485 (emphasis supplied).[28]

---

[28] In both *Thomas* and *Hobson* the statement was made to a police officer and the government's lawyer was not present. The courts nevertheless concluded that the disciplinary rule had been violated, and that the statement should be suppressed. The rationale is that the police, after commencement of prosecution, are acting as investigators for the prosecutor. See ABA Opinion 95 and *People v Patterson,* 39 Mich App 467, 475; 198 NW2d 175 (1972) (Levin, P.J., dissenting).

See *United States v Wedra,* 343 F Supp 1183 (SD NY, 1972), where the defendant was questioned in the absence of and without the knowledge of his attorney. After being given *Miranda* warnings, the defendant was asked if he cared to make a statement. He replied in the negative, but did answer a series of questions. Defendant sought

IV

I do not believe that the Court intends to circumscribe its powers to the extent that it cannot enforce the Code of Professional Responsibility except through disciplinary proceedings. Just a year ago, in *Smith v Arc-Mation, Inc,* 402 Mich 115; 261 NW2d 713 (1978), the Court indicated its willingness to enforce the canons in individual cases. Although we found no violation of the canons warranting the attorney's disqualification,

to suppress the answers, which the government contended were falsely exculpatory. The court suppressed, finding that defendant did not waive his constitutional right to counsel and to remain silent. The court offered as an independent ground ("[e]ntirely apart") its supervisory power to suppress statements unethically obtained. After referring to old Canon 9 and the Code of Professional Responsibility, Ethical Consideration 7-18 and DR 7-104, the court said:

"I see little point in well-intentioned utterances denouncing in-custody interrogation of an accused person known to be represented by counsel without affording counsel an opportunity to be present, or in condemning prosecuting attorneys who take part in such interrogation in violation of professional ethics and then allowing the government to become the beneficiary of the condemned conduct. The only effective way to terminate this unfair and at times unethical practice is to prohibit the government from using its illicit fruits." *Id.,* pp 1188-1189.

See, also, *United States v Brown,* fn 5 *supra* (Simpson, J., dissenting); *Coughlan v United States,* fn 5 *supra* (Hamley, J., dissenting).

See, also, *United States v Springer,* fn 5 *supra;* and *United States v Smith,* fn 6 *supra,* where the courts recognized that they had the authority to exclude evidence obtained in violation of old Canon 9 but chose not to.

But see *Reinke v United States,* 405 F2d 228 (CA 9, 1968); *State v Yatman,* 320 So 2d 401 (Fla App, 1975); *State v McConnell,* 529 SW2d 185 (Mo App, 1975). In *State v Richmond,* 114 Ariz 186; 560 P2d 41 (1976), *cert den* 433 US 915 (1977); and *State v Nicholson,* 77 Wash 2d 415; 463 P2d 633 (1969), the courts refused in criminal cases to suppress unethically obtained evidence, finding that DR 7-104 is designed to afford protection only to civil litigants. In *United States v Crook,* fn 5 *supra,* the court held that it was precluded from exercising its supervisory power to exclude evidence unethically obtained in a criminal case by the Omnibus Crime Control and Safe Streets Act of 1968, PL 90-351; 18 USC 3501(a), which provides that "[i]f the trial judge determines that the confession was voluntarily made it shall be admitted in evidence * * *".

there was no hint that a court could not act in cases before it but must await disciplinary proceedings.

Adoption of such a limiting rule of law might prevent, for example, a court granting relief to an individual charged an excessive contingent fee in violation of GCR 1963, 928, adopted pursuant to the same supervisory authority as the Code of Professional Responsibility. The Court surely does not intend such far-reaching results and yet they are implicit in a holding that disciplinary proceedings are the only proper remedy for violations of Court-promulgated standards.

If the Court chooses later to avoid such results by holding that the code is enforceable in civil cases but not in criminal cases, or in some criminal cases but not first-degree murder cases, it will, I think, be extremely difficult to advance a principled basis for such a distinction.

DR 7-104(A)(1) was violated in this case. As a result, the prosecutor who violated the rule obtained statements he might not otherwise have obtained which were used against Green. DR 7-104(A)(1) is designed to protect people, not abstractions. This Court should effectuate that protection in the only way which would be meaningful in this case—by reversing Green's conviction and ordering a new trial at which his statement would be suppressed.